The STATE of Texas, Appellant

v.

Mikenzie Renee RODRIGUEZ,
Appellee

NO. PD-1391-15

Court of Criminal Appeals of Texas.

Filed: June 7, 2017

4

ATTORNEYS FOR APPELLANT: Matthew Wright, DLW Law, PLLC, PO Box 522, Rosebud, TX 76570, Sharon Lanell Diaz, DLW Law, 406 W Main St, Rosebud, TX 76570.

ATTORNEYS FOR THE STATE: Elisha Bird, Assistant District Attorney, 35th District Attorney's Office, 200 S. Broadway, Brownwood, TX 76801.

## OPINION

Newell, J., delivered the opinion of the Court in which Hervey, Alcala, Richardson, Yeary, Keel, and Walker, JJ., joined.

Resident assistants searched the dorm room of Mikenzie Renee Rodriguez, found drugs, and called their director, who in turn called the police. The police then entered the room and seized the drugs. Rodriguez was indicted for possession of a controlled substance. The trial court granted Rodriguez's motion to suppress and, on the State's appeal, the court of appeals affirmed—holding there is no college dorm room exception to the Fourth Amendment. *State v. Rodriguez*, —— S.W.3d ——, 2015 WL 5714548 (Tex. App.—Eastland 2015). We granted review because this is an issue

of first impression to this Court. We agree with the court of appeals that the officers' physical intrusion into a constitutionally protected area was a search within the meaning of the Fourth Amendment. And because it was done without a warrant, consent, or special needs, the fruits of that search were rightly suppressed. We affirm.

## I. Motion to Suppress

At the hearing on the motion to suppress, the only issue before the trial court was whether the police search was lawful; Appellee did not challenge the search by the civilians. Witnesses testified that Appellee and Adrienne Sanchez, freshman students at Howard Payne University in Brownwood, Texas, shared a dorm room on campus. A housing agreement permitted routine inspections by authorized personnel.[1] Pursuant to this agreement, resident assistants ("RAs") Miriam Mackey and Catherine Mullaney performed room checks for items that residents were not supposed to have such as candles, microwave ovens, and more obviously prohibited items such as drugs or alcohol. They performed the checks as a matter of course, not at the behest of any law enforcement agency.

When the RAs performed their normal room check on the room shared by Appellee and Sanchez, there was no one in the

---

1. The Howard Payne University Handbook includes a section called "Room Inspections." It provides:

 Duly authorized personnel of HPU reserve the right to enter student rooms at any time for emergency purposes or for the purpose of maintenance, repair, and inspection for health, safety, or violation of University regulations. Students are expected to maintain neat and orderly rooms. Periodically throughout the semester, Resident Directors and/or Resident Assistants will conduct health, hygiene, safety, and security checks in residence hall rooms. At room-

 check, all rooms must comply with the standards given by the Resident Director/ Resident Assistant.

 Custodial service is limited to cleaning public use areas and emptying trash from public area receptacles. Trash should not be swept into the hall, but should be deposited in public area waste containers. Students are not permitted to store empty alcohol bottles, cans, etc. in their residence hall rooms. Any unauthorized items should be reported to the Resident Assistant.

 State's Exhibit 3, Howard Payne University Handbook at 43.

room. They found marijuana in the first trunk they looked through. The RAs contacted Nancy Pryor, the resident director, who told them to do a more thorough search. The RAs subsequently found a matchbox containing what they believed to be ecstacy pills in the bottom of a basket full of fingernail polish and a pipe inside a sock that had tape wrapped around it. The RAs laid the pill box and the pipe on the floor and took cell phone pictures of the items.

The resident director contacted the Howard Payne Police. Howard Payne Officer Robert Pacatte, in plain clothes but with a badge, responded, and Pryor took him up to the room. Officer Pacatte entered the room and looked around.

Q. When you got to the room, were you able to see anything out in plain view that you would identify as contraband?

A. Yes, ma'am. On the floor were several items that the ladies had found and had placed on the floor. One would be a—do you mind if I look at my notes for a second?

Q. That's fine.

A. One was a glass pipe, a cigarette lighter, a box of wooden matches that was open and it had two pills laying on top of them, on top of the matches that were in the box, and I don't—I said a cigarette lighter was there also. And then I was shown across the room to a foot locker that was open and empty with the exception of a cigarette lighter and a small package that I believed to be—have in it what I believed to be marijuana.

He took some photos and contacted the Brownwood Police. Officer Pacatte acknowledged that he did not have a warrant and that "[i]t would have been easy enough to obtain a warrant." He also stated that there were no exigent circumstances, and that he did not ask for consent before entering the room to investigate and photograph the contraband.

Meanwhile, Adrienne Sanchez returned to the dorm room. When she opened the door she saw the two RAs, the resident director, and the campus police officer. At first, they told her to wait in the hall, but then allowed her in so that she could change clothes. Officer Pacatte "checked" her clothes. He never asked her for consent to search the room. The group did let her leave to go eat. She came back with her coach and, by then, the Brownwood detectives had arrived. Again, she wasn't asked for consent to search the room. As Sanchez explained, "[T]he detectives talked to me, asked me what objects in the room, if they were mine or if they were Mikenzie's, and that was about it." Then they let her out.

Sanchez told the officers that the items belonged to her roommate, Appellee. Officer Pacatte handed Brownwood Detective Joe Aaron Taylor a plastic sack that had the items in it. Appellee then arrived. After she was read her rights, she admitted that the contraband was hers and said that the pills were Ecstasy. Detective Taylor said the items were not "in plain view" in the traditional sense because a civilian had moved the items from their original place. Detective Taylor also said it would not have been difficult to obtain a warrant, and that the items seized were not in danger of destruction. The defense argued that the police conduct constituted a search.

We have never said that the RAs were State actors. That's not an issue. The issue is that once the police became involved and this became a prosecutorial search, which is what the law, the case law, stipulates, then, it becomes—you have to follow the Fourth Amendment and Article 1 guarantees.

According to the defense, the entry was a search, and no exception applied. The State countered that this "is a classic situation where someone who is not a state actor found drugs, notified law enforcement, and when law enforcement got there, it's obvious and plain the minute they are on the scene what it is." But if it were a search "Ms. Pryor, as an official at the university, would have had apparent authority to invite the officer in."

The trial court granted the motion to suppress, finding that the warrantless search of Appellee's residence, without the existence of an applicable exception, violated the Fourth Amendment. On direct appeal, the State, relying in part on *Medlock v. Trustees of Ind. Univ.*, No. 1:11-CV-00977-TWP-DKL, 2011 WL 4068453 (S.D. Ind. Sept. 13, 2011), argued that, under the "private search" doctrine, the officers' entry into Appellee's dorm room did not constitute a search: At the time of their entry, Appellee no longer possessed a subjective expectation of privacy that society would be willing to recognize as reasonable. In *Medlock*, Zachary Medlock had sought a preliminary injunction to prevent enforcement of his one-year suspension from Indiana University, the result of the discovery of marijuana and drug paraphernalia in his university dormitory room. *Id.* at *1. Medlock alleged that the search of his room by state school officials (and later the campus police) violated the Fourth Amendment. *Id.* at *4. In denying the preliminary injunction, the Southern District Court of Indiana noted that Medlock was unlikely to succeed in his claim because once resident advisors were lawfully inside his room to perform a health and safety inspection and discovered marijuana, they were justified in giving access to

law enforcement officers. *Medlock*, 2011 WL 4068453, at *5-6.[2]

## II. Appeal

The court of appeals rejected the State's argument, noting that (1) the physical entry of the home is a search; (2) Appellee's dorm room is her home; and therefore, (3) the officers' physical entry into Appellee's dorm room constituted a search. *Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548, at *4-6. The court found *Medlock* distinguishable because (1) it involved an administrative proceeding with Indiana University rather than a criminal prosecution; (2) the officer in *Medlock* observed the marijuana in plain view prior to entering the dorm room; and (3) the officer in *Medlock* actually obtained a search warrant. *Id.* at ——, 2015 WL 5714548, at *5. The appellate court also agreed with the trial court's conclusion that the State failed to prove that the resident director had the authority, actual or apparent, to permit the officers to enter Appellee's dorm room without a search warrant. *Id.* at ——, 2015 WL 5714548, at *6-7.

The court of appeals distinguished the search here from the dorm room search upheld in *Grubbs v. State*, 177 S.W.3d 313 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Grubbs had argued that the RA who had entered to investigate the odor of marijuana opened the door for the police, but the record showed that the officers waited in the hall and only entered after Grubbs or his roommate invited the officers in. *Rodriguez*, —— S.W.3d at —— –——, 2015 WL 5714548, at *5-6; *Grubbs*, 177 S.W.3d at 316-18. Here, though, it was dorm personnel who led the officers to Appellee's dorm room. "Despite the authority given to the dorm personnel to

---

**2.** As the court had predicted, Medlock ultimately lost his lawsuit. *Medlock v. Trustees of Indiana Univ.*, 1:11-CV-00977-TWP, 2013 WL 1309760, at *1 (S.D. Ind. Mar. 28, 2013), *aff'd*, 738 F.3d 867 (7th Cir. 2013).

enter the dorm room themselves, they simply did not have authority to give police officers consent to enter Appellee's dorm room." *Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548, at *6.

The court of appeals pointed to *Piazzola v. Watkins*, 442 F.2d 284 (5th Cir. 1971). There, law enforcement officers, accompanied by Troy State University officials, searched six or seven dormitory rooms located in two separate residence halls. The search was based on a tip that students living in those rooms had marijuana. *Id.* at 286. In holding the search of Piazzola's dorm room unconstitutional, the Fifth Circuit noted that a dorm room is analogous to an apartment or a hotel room—a place in which Piazzola maintained a reasonable expectation of freedom from governmental intrusion. *Id.* at 288.

The court of appeals quoted this passage from *Piazzola*:

"[A] student who occupies a college dormitory room enjoys the protection of the Fourth Amendment. True the University retains broad supervisory powers which permit it to adopt the regulation heretofore quoted, provided that regulation is reasonably construed and is limited in its application to further the University's function as an educational institution. The regulation cannot be construed or applied so as to give consent to a search for evidence for the primary purpose of a criminal prosecution. Otherwise, the regulation itself would constitute an unconstitutional attempt to require a student to waive his protection from unreasonable searches and seizures as a condition to his occupancy of a college dormitory room. Clearly the University had no authority to consent to or join in a police search for evidence of crime."

*Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548, at *6 (quoting *Piazzola*, 442 F.2d at 289-90).

The State filed a petition for discretionary review, arguing that there was no Fourth Amendment search, but, if there were one, it was justified under either the special needs or consent exceptions to the warrant requirement.

## III. Standard of Review

■■■ In reviewing a motion to suppress, we apply a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). Trial courts are given almost complete deference in determining historical facts. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). When a trial judge makes express findings of fact, an appellate court must examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). The appellate court then proceeds to a *de novo* determination of the legal significance of the facts as found by the trial court—including the determination of whether a specific search or seizure was reasonable. *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004).

## IV. The Fourth Amendment

■■■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. The central concern underlying the Fourth Amendment has remained the same throughout the centuries; it is the concern about giving police officers unbridled discretion to rummage at will among a person's private effects. *State v. Granville*,

423 S.W.3d 399, 405 (Tex. Crim. App. 2014). A Fourth Amendment claim may be based on a trespass theory of search (one's own personal effects have been trespassed), or a privacy theory of search (one's own expectation of privacy was breached). *Ford v. State*, 477 S.W.3d 321, 328 (Tex. Crim. App. 2015). If the government obtains information by physically intruding on persons, houses, papers, or effects, a trespass search has occurred. *United States v. Jones*, 565 U.S. 400, 404-05, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). If the government obtains information by violating a person's reasonable expectation of privacy, regardless of the presence or absence of a physical intrusion into any given enclosure, a privacy search has occurred. *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 1417, 185 L.Ed.2d 495 (2013); *Kyllo v. United States*, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). A search, conducted without a warrant, is *per se* unreasonable, subject to certain "jealously and carefully drawn" exceptions. *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

 The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Of course, Fourth Amendment protections of the "home" are not limited to houses. While a landlord may have limited authority to enter to perform repairs, a landlord does not have the general authority to consent to a search of a tenant's private living space. *Maxwell v. State*, 73 S.W.3d 278, 282 n. 3 (Tex. Crim. App. 2002) (citing *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961)). Nor may a hotel clerk validly consent to the search of a room that has been rented to a customer. *Maxwell, id.* (citing *Stoner v.*

*California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)).

 And, as a general matter, " '[a] dormitory room is analogous to an apartment or a hotel room.' " *Piazzola*, 442 F.2d at 288 (quoting *Com. v. McCloskey*, 217 Pa.Super. 432, 272 A.2d 271, 273 (1970)). " 'It certainly offers its occupant a more reasonable expectation of freedom from governmental intrusion than does a public telephone booth.' " *Id.* Courts have widely agreed that a dorm room is a home away from home. Dorm personnel can—by virtue of contract—enter dorm rooms and examine, without a warrant, the personal effects of students that are kept there in order to maintain a safe and secure campus, or to enforce a campus rule or regulation; the students nevertheless enjoy the right of privacy and freedom from an unreasonable search or seizure. See *Grubbs*, 177 S.W.3d at 318; *People v. Superior Court, (Walker)* 143 Cal.App. 4th 1183, 1209, 49 Cal.Rptr.3d 831 (Cal. Ct. App. 2006); *Beauchamp v. State*, 742 So.2d 431, 432 (Fla. Dist. Ct. App. 1999); *Com. v. Neilson*, 423 Mass. 75, 666 N.E.2d 984, 985-86 (1996); *Morale v. Grigel*, 422 F.Supp. 988, 997 (D.N.H. 1976); *Smyth v. Lubbers*, 398 F.Supp. 777, 786 (W.D. Mich. 1975); *People v. Cohen*, 57 Misc.2d 366, 292 N.Y.S.2d 706, 713 (Dist. Ct. 1968), *aff'd*, 61 Misc.2d 858, 306 N.Y.S.2d 788 (Sup. Ct. 1969). The student is the tenant, the college the landlord. As the court of appeals put it: "Appellee enjoyed the same Fourth Amendment protection from unreasonable searches and seizures in her dormitory room as would any other citizen in a private home." *Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548, at *4.

 A warrantless entry into a home is a search under either a privacy or a trespassory theory. *Jones*, 565 U.S. at 406–09, 132 S.Ct. 945 ("the *Katz* reasonable-expectation-of-privacy test has been

*added to*, not *substituted for*, the common-law trespassory test"). Established exceptions to the warrant requirement include the consent exception, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the exigency exception, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the automobile exception, *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), the search-incident-to-arrest exception, *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and the special-needs exception, *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Therefore, before police officers may conduct a search they must obtain a warrant or show that a recognized exception to the warrant requirement applies. *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). The Supreme Court "has never said that mere convenience in gathering evidence justifies an exception to the warrant requirement." *Birchfield v. North Dakota*, ── U.S. ──, 136 S.Ct. 2160, 2194, 195 L.Ed.2d 560 (2016) (Sotomayor, J., concurring in part and dissenting in part). "If the simple collection of evidence justifies an exception to the warrant requirement even where a warrant could be easily obtained, exceptions would become the rule." *Id.* As Justice Jackson put it, "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The State bears the burden of establishing that a warrantless search falls under one of these exceptions. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007).

## V. The University Search of Appellee's Dorm Room Did Not Extinguish Appellee's Legitimate Expectation of Privacy And the Police Search Violated the Fourth Amendment

The State argues that there was no invasion of privacy by law enforcement sufficient for the Fourth Amendment to attach. Alternatively, the State argues that any search did not run afoul of the Fourth Amendment because the search was reasonable under either the special needs doctrine or the consent doctrine. We first examine whether the police officers' physical intrusion into Appellee's dorm room was a search within the meaning of the Fourth Amendment. It was. We then look to see if the search was reasonable under the Fourth Amendment. In this case, it was not.

### A. The Private-Party-Search Doctrine

 The State does not appear to argue that a college student completely lacks any expectation of privacy in his or her dorm room. Rather, the State argues that Appellee's existing privacy rights in her dorm room had been frustrated by a private party search. According to the State, this prior search extinguished any legitimate expectation of privacy Appellee had in her dorm room. Under this theory, no "new" search occurred because the original search was carried out by private actors and the officers' subsequent search of the room did not exceed the scope of the private search.

The United States Supreme Court first recognized the private-party-search doctrine in *Burdeau v. McDowell*. There, the Court held that the Fourth Amendment's warrant requirement applies only to government agents, not private actors. 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048

(1921). Private detectives had taken McDowell's personal papers and turned them over to prosecutors. *Id.* at 474, 41 S.Ct. 574. The Supreme Court held it "manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another." *Id.* at 475, 41 S.Ct. 574.

 The private-party-search doctrine is often applied in bailee cases in which the private person (e.g., the mechanic, the computer repairman, the airline baggage handler etc.) had legal possession of the item when he conducted the search. *See* 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 1.8(a); *United States v. Seldon*, 479 F.3d 340, 341 (4th Cir. 2007) (service technicians find a false compartment in a van that had been brought to the dealership for repair); *Rogers v. State*, 113 S.W.3d 452, 454-55 (Tex. App.—San Antonio 2003, no pet.) (computer technician finds files containing child pornography on computer voluntarily relinquished to computer repair store); *United States v. Blanton*, 479 F.2d 327, 327-28 (5th Cir. 1973) (airline employee finds illegal firearm in search of unclaimed bag). In such cases, the bailors assume the risk that the bailees would allow police access, and, therefore, they cannot complain that they maintain an expectation of privacy in the property searched.

In other private-party-search cases, the property is simply seized by a private person—legally or not—and turned over to the police without the police having entered a protected area. *Cobb v. State*, 85 S.W.3d 258, 270-71 (Tex. Crim. App. 2002)

(holding that Fourth Amendment was not implicated when private citizen took knives from his son's apartment); *Bodde v. State*, 568 S.W.2d 344, 352-53 (Tex. Crim. App. 1978) (Bodde's landlady took bonds and rings belonging to the deceased from Bodde's apartment and turned them over to the police); *Stone v. State*, 574 S.W.2d 85, 87 (Tex. Crim. App. [Panel Op.] 1978) (Stone's babysitter gathered photographs depicting sexual assault from Stone's residence and gave them to the housing manager, who in turn gave them to the police).[3] In these cases the police make no search at all as the property is seized by a private party without any intrusion on an expectation of privacy by law enforcement. The question remains: How free are the police to do what was done earlier by a private party?

In *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court ruled that additional invasions of privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search. *Id.* at 115, 104 S.Ct. 1652. There, Federal Express employees opened a damaged box, found a tube wrapped in newspaper, cut open the tube, and discovered clear plastic bags containing a white powdery substance. *Id.* at 111, 104 S.Ct. 1652. The employees then notified the DEA, replaced the plastic bags in the tube, and put the tube back into the box. *Id.* When a DEA agent arrived, he removed the tube from the box and the plastic bags from the tube, saw the white powder, opened the bags, removed a trace of the powder, subjected

---

3. In Texas, of course, the statutory exclusionary rule applies to searches and seizures by private citizens. TEX. CODE CRIM. PROC. art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the

United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."); *see also Cobb*, 85 S.W.3d at 270-71 (analyzing whether Article 38.23 required suppression of evidence seized by defendant's father from defendant's apartment).

it to a field chemical test, and determined it was cocaine. *Id.* at 111-12, 104 S.Ct. 1652. The Supreme Court held that the DEA did not invade upon any reasonable expectation of privacy by physically examining the powdery substance because the expectations of privacy in the package had already been frustrated by the actions of nongovernmental third parties. *Id.* at 117–21, 104 S.Ct. 1652. The Court further held that the chemical test, that disclosed whether or not a particular substance is cocaine, did not compromise any legitimate interest in privacy. *Id.* at 123, 104 S.Ct. 1652. Because the field test could reveal "no other arguably 'private' fact," the test "compromise[d] no legitimate privacy interest." *Id.*

We relied on *Jacobsen* in *State v. Hardy* to hold that the State's acquisition of medical records containing the results of blood-alcohol tests taken by hospital personnel did not invade the defendant's legitimate expectation of privacy. 963 S.W.2d 516 (Tex. Crim. App. 1997). We noted that "whatever interests society may have in safeguarding the privacy of medical records, they are not sufficiently strong to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident." *Id.* at 526-27.

Similarly, in *State v. Huse*, we held that *Hardy* survived the subsequent enactment of HIPAA. 491 S.W.3d 833, 842-43 (Tex. Crim. App. 2016). We noted that the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party. *Id.* at 840. And we explained that whatever insulation HIPAA provides against third-party disclosure of medical records in general, it does not extend to the disclosure of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident. *Id.* at 842. Similar

to an application of the private-party-search doctrine, we essentially held in both *Hardy* and *Huse* that the Fourth Amendment did not apply to the initial search—the extraction and testing of the blood—by private parties and that the State's subsequent acquisition of medical records from those private parties without any intrusion into a protected area by law enforcement also did not implicate the Fourth Amendment. We did not hold in those cases that police could conduct a second, warrantless blood draw based upon the fact that private citizens had already drawn the defendants' blood.

In the context of a search of a residence, the *Jacobsen* Court itself suggested that a police search duplicating a private search of a home would violate the Fourth Amendment. Justice White, concurring in *Jacobsen*, stated,

> If a private party breaks into a locked suitcase, a locked car, or even a locked house, observes incriminating information, returns the object of his search to its prior locked condition, and then reports his findings to the police, the majority apparently would allow the police to duplicate the prior search on the ground that the private search vitiated the owner's expectation of privacy.

*Jacobsen*, 466 U.S. at 132, 104 S.Ct. 1652 (White, J., concurring). The majority responded by rejecting the suggestion that police could seize and search a "container" simply upon learning from a private individual that the container contains contraband.

> Contrary to Justice WHITE's suggestion, we do not "sanction warrantless searches of closed or covered containers or packages whenever probable cause exists as a result of a prior private search." A container which can support a reasonable expectation of privacy may

not be searched, even on probable cause, without a warrant.

*Id.* at 120 n. 17, 104 S.Ct. 1652 (internal citation and some punctuation omitted). As the majority in *Jacobsen* explained, the police did not have to unseal the compromised container after learning of its contents from the private parties; the police could see that it contained contraband without the need for re-opening the package. *Id.* at 121, 104 S.Ct. 1652 ("Accordingly, since it was apparent that the tube and plastic bags contained contraband and little else, this warrantless seizure was reasonable.").

As Justice White suggested in his concurrence, a house is a container that supports a reasonable expectation of privacy, one generally not vitiated by the presence of a third party or the existence of probable cause. *Chapman*, 365 U.S. at 616–17, 81 S.Ct. 776 (state police officers did not have the right to enter a tenant's premises by forcing open a window, even with the landlord's consent, to search for distilling equipment); *State v. Cuong Phu Le*, 463 S.W.3d 872, 879 (Tex. Crim. App. 2015) (odor of marijuana may not be enough to justify a warrantless search based upon exigent circumstances; it can still provide probable cause to support a search warrant). We agree with those jurisdictions that have refused to extend the holding of *Jacobsen* to cases involving private searches of residences. *See United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997); *United States v. Williams*, 354 F.3d 497, 510 (6th Cir. 2003); *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009); *State v. Miggler*, 419 N.W.2d 81, 84 (Minn. Ct. App. 1988); *see also People v. Brewer*, 690 P.2d 860, 863 n. 3 (Colo. 1984). The New Jersey Supreme Court, declining to apply the third-party search doctrine to a case in which the landlord and plumber, after finding drugs in defendant's apartment, invited the police in, put it best:

> [A] private home is not like a package in transit. We recognize that residents have a reduced expectation of privacy in their home whenever a landlord or guest enters the premises. But residents do not thereby forfeit an expectation of privacy as to the police. In other words, an invitation to a plumber, a dinner guest, or a landlord does not open the door to one's home to a warrantless search by a police officer.

*State v. Wright*, 221 N.J. 456, 114 A.3d 340, 352 (2015).

The State notes authority for the opposite proposition—that if a private person searches the premises of another and then reports to police what he has found (instead of removing the evidence and handing it over to the police), then the police can make a warrantless entry to seize the evidence. We do not find these cases persuasive. In *United States v. Jones*, 421 F.3d 359 (5th Cir. 2005), for instance, the Fifth Circuit held that the Fourth Amendment was not violated when an apartment manager and a pest exterminator discovered drugs in plain view in an apartment. *Id.* at 361. The manager contacted the security guard for the complex, who was also a resident of the complex, and a police officer to accompany her back into the apartment as a safety precaution so she could confirm her suspicions regarding the drugs. *Id.* Notably, the officer in *Jones* did not conduct any search or seizure himself beyond entry with the apartment manager. *Id.* at 362. Rather, he called a narcotics investigator, informed him of what he had seen, and requested that the investigator get a search warrant for the apartment. *Id.* at 361.

And, the same thing happened in *Medlock*. Officer King, "who looked in the student's closet and found himself face to face

with a six-foot-high marijuana plant ... left to get a warrant to search the room for drugs and drug paraphernalia[.]" *Medlock*, 738 F.3d at 870. In each case, the officers maintained the status quo while law enforcement secured a search warrant in good faith. *See, e.g., Segura v. United States*, 468 U.S. 796, 798, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (holding that officers do not violate the Fourth Amendment when they enter a premises with probable cause and secure it from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant).

 More importantly, these cases conflate the inquiry into whether a privacy interest exists with the reasonableness of the invasion into that privacy interest. Noting the existence of a housing agreement that allows routine inspections might impact whether a search by law enforcement is reasonable under an exception to the warrant requirement such as a "special needs" exception or even consent; but it does not render the Fourth Amendment inapplicable. *See Camara v. Mun. Court of City & County of San Francisco*, 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (inspectors, acting pursuant to a San Francisco ordinance that allowed them to enter a building without a warrant and check for possible building code violations, intruded upon the interests protected by the Fourth Amendment; routine building inspections require warrants because the burden of obtaining a warrant is not likely to frustrate the governmental purpose behind the search). As the late Justice Scalia explained in his concurring opinion in *O'Connor v. Ortega*, "A man enjoys Fourth Amendment protection in his home, for example, even though his wife and children have the run of the place—and indeed, even though his landlord has the right to conduct unannounced inspections at any

time." 480 U.S. at 730, 107 S.Ct. 1492 (Scalia, J. concurring). Constitutional protection against *unreasonable* searches by the government does not disappear merely because the property owner has the right to make reasonable intrusions in its capacity as landlord. *Id.*

This case is more like those in multiple other jurisdictions holding that a college student retains an expectation of privacy in his or her dorm room even though university officials may enter the dorm for routine searches. For example, in *Commonwealth v. Neilson*, public college officials, who had reserved the right to inspect dormitory rooms, entered Neilson's dormitory room to investigate the prohibited keeping of a cat. 423 Mass. 75, 666 N.E.2d 984 (1996). The officials inadvertently discovered a marijuana-growing operation. Instead of seizing the marijuana and turning it over to the police, or providing information to the police so they could get a search warrant, the officials invited the police to enter the room and seize the marijuana plants. The *Neilson* court held that, because the police entered the room without a warrant, consent, or exigent circumstances, the search was unreasonable and violated the defendant's Fourth Amendment rights. *Id.* at 987; *See also State v. Houvener*, 145 Wash.App. 408, 186 P.3d 370, 376 (2008); *Walker*, 143 Cal. App. 4th at 1209, 49 Cal.Rptr.3d 831; *Piazzola*, 442 F.2d at 289; *Cohen*, 292 N.Y.S.2d at 709; *McCloskey*, 272 A.2d at 273; *Morale*, 422 F.Supp. at 997; *Smyth*, 398 F.Supp. at 786; *State v. Jordan*, 225 P.3d 1211 (Kan. Ct. App. 2010) (unpublished table op.); *State v. Ellis*, No. 05CA78, 2006 WL 827376 (Ohio Ct. App. March 31, 2006) (not designated for publication). *See also* Andrew MacKie-Mason, *The Private Search Doctrine After Jones*, 126 YALE L. J. FORUM 326 (2017) (arguing that *Jacobsen's* holding is limited to the *Katz* half of the definition of "search"; "*Jacobsen* focused

on the ease with which an individual's privacy interest may be eroded; the property interest central to *Jones*, however, is not so easily destroyed. Thus, a prior private search does not have the same relevance to a trespass inquiry as it does to a privacy inquiry.").

We decline to extend the private-party-search doctrine to a residence, in this case, a college dorm room. Appellee retained her expectation of privacy in her room even though school officials had already entered the room pursuant to the housing agreement. Because it is undisputed that the search—whether classified a trespassory invasion or expectation of privacy violation—[4] occurred without a search warrant, we consider whether the search was justified under an exception to the warrant requirement.

### B. The "Special Needs" Exception

The State is correct that some school searches fall under the special needs exception.[5] Under the special needs exception, a warrantless search is reasonable when " 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring in judgment)). In *New Jersey v. T.L.O.*, a teacher at Piscataway High School in Middlesex County, N.J., discovered two girls smoking in a lavatory. *Id.* at 328, 105 S.Ct. 733. The teacher notified a principal, who then searched T.L.O.'s purse and found a pack of cigarettes and a pack of rolling papers, and, after a further search, marijuana, plastic bags, small bills, and a ledger of students owing money. *Id.* at 328-29, 105 S.Ct. 733. The principal turned the evidence of drug dealing over to the police. *Id.* The Court rejected the argument that the warrantless search by the principal violated the Fourth Amendment and held that public schools presented a "special need," which allowed a departure from the warrant and probable cause requirements. *Id.* at 341, 105 S.Ct. 733. The Court said that the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. *Id.* at 344, 105 S.Ct. 733. The Court held that school teachers and administrators could search students without a warrant if: (1) there exists "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school;" and (2) the search is "not excessively intrusive in light

---

4. The trial court made a finding that the officers both entered and physically searched the room.

> 23. Howard Payne University Department of Public Safety and the City of Brownwood Police Department entered the residence of Adrienne Sanchez and Mikenzie Renee Rodriguez when neither occupant was present and conducted a search that included—taking photographs of the room, investigating, and looking around the room. The officers who conducted the search seized items believed to be a controlled substance, paraphernalia, and marijuana.

This finding is fairly supported by the record. See dissent at note 24.

5. This issue is not directly addressed in the court of appeals' opinion. But the State did rely, in the trial court and at the court of appeals, at least to a degree, on the "unique relationship" between universities and their students, and specifically cited the *Medlock* decision of the Southern District of Indiana to both the trial court, and the court of appeals. *Medlock v. Trustees of Indiana Univ.*, 1:11-CV-00977-TWP, 2011 WL 4068453, at *5-6 (S.D. Ind. Sept. 13, 2011) (not designated for publication), *aff'd*, 738 F.3d 867, 872–73 (7th Cir. 2013). We therefore find this argument preserved.

of the age and sex of the student and the nature of the infraction." *Id.* at 341-42, 105 S.Ct. 733. That standard was met in *T.L.O.*

 Under the *T.L.O.* test, public school teachers and administrators can search a public school student's locker, desk, person, backpack, or car without a warrant based upon reasonable suspicion rather than probable cause. Two circumstances underpin the application of the special needs doctrine to school searches: (1) the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds; and (2) the fact that the students who are being searched, or whose property is being searched, are usually unemancipated minors required by compulsory attendance laws to attend classes. *T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733; *Vernonia School District 47J v. Acton*, 515 U.S. 646, 655-57, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("*T.L.O.* did not deny, but indeed emphasized, that the nature of [the State's power over schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults"). The first one is present in this case. The second is not.

 Nothing in the Supreme Court's school cases suggests the "special needs" allow police to search a university student's living quarters without a warrant based upon reasonable suspicion. *T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733; *Vernonia School District 47J*, 515 U.S. at 655-57, 115 S.Ct. 2386; *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 838, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). Even if the special needs exception applied in the university setting, we would balance the need to search against the intrusiveness of the search. And in so weighing, the consequence of the search does bear on the seriousness of the privacy intrusion.[6] In *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, for example, the Supreme Court decided that public schools could constitutionally require suspicionless drug testing of students participating in extracurricular activities. 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). Writing for the majority, Justice Thomas described the testing as a "negligible" intrusion, in part because "the test results are not turned over to any law enforcement and the only consequence of a failed drug test is to limit the student's privilege of participating in extracurricular activities." *Id.* at 833, 122 S.Ct. 2559 (citing *Vernonia School Dist. 47J*, 515 U.S. at 658, 115 S.Ct. 2386).

Conversely, in *Safford Unified Sch. Dist. No. 1 v. Redding*, the Court held unconstitutional the strip search of 13–year–old Savana Redding by school officials on school property. 557 U.S. 364, 376-77, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). The officials were looking for a small number of ibuprofen and naproxen pills which posed a "limited threat." *Id.* at 368, 129 S.Ct. 2633. And the intrusion—to meet that limited threat—was anything but "negligible." *Id.* at 375, 129 S.Ct. 2633. The categorically distinct type of search required "distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings," which were simply not present. *Id.* at 374, 129 S.Ct. 2633.

In sum, what was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their

**6.** *See Developments in the Law–Policing: Policing Students,* 128 Harv. L. Rev. 1706, 1747, 1762 (April 2015).

quantity, and any reason to suppose that Savana was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.

*Redding*, 557 U.S. at 376–77, 129 S.Ct. 2633. In this case, as in *Redding*, the degree of the intrusion (entry into a private residence) does not match the strength of the initial suspicion and the danger of the contraband (a little marijuana and a couple of pills) to the adult students.

But even if, as the dissent argues, Officer Pacatte could enter the dorm room to collect the drugs as "duly authorized personnel of HPU" he could only do so for "health, safety, or violations of University regulations."[7] *See Commonwealth v. Carr*, 458 Mass. 295, 936 N.E.2d 883, 885 (Mass. 2010) (even if private Boston College police officers' initial warrantless entry into dorm room was lawful the trial judge did not err in finding that the Commonwealth failed to satisfy its burden of proving the voluntary consent of the defendants to search their room). The Fourth Amendment still applies; the scope of the license to enter is limited to a specific purpose. Warrant and probable-cause requirements, to the extent they are waived not only as to HPU civilian personnel but as to HPU police officers, are waived on the assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes.

And so it is that the drugs found in Medlock's dorm room were used to suspend him, not to prosecute him. *Medlock*, 738 F.3d at 869 (noting that the inspectors look for violations of prohibited items—from candles to cats to illegal drugs—in the code of conduct for dormitory residents; "expulsion are among the authorized penalties."). As the court of appeals observed, *Medlock* is distinguishable because it involved an administrative proceeding with Indiana University rather than a criminal prosecution. *Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548 at *5. More importantly, as mentioned above, the officer in *Medlock* also obtained a search warrant; none of the officers did so in this case.

HPU's stated intent to "cooperate fully with the Federal Government, the State of Texas, and local authorities in the war against drug and alcohol abuse" is just that: a stated intent to cooperate. It is not a clause that becomes "operable" upon the discovery of illegal drugs in a student's dorm room to trump the rule that a warrantless search or seizure is per se unreasonable unless it falls under a recognized exception to the warrant requirement. Even if Officer Pacatte was acting as a private security officer rather than a regular police officer, the same cannot be said for the city officers whose entry and seizure was absolutely subject to the Fourth Amendment. *Cf. Limpuangthip v. United States*, 932 A.2d 1137, 1143 (private university officers who were only peripherally involved in the search of Limpuangthip's dorm room were not acting in their "public" role, so Fourth Amendment not "called into play."). Any authority granted to Officer Pacatte by virtue of the student handbook did not extend to the city officers. As Justice Scalia put it, "special needs" searches must be justified, always, by concerns "other than crime detection." *Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 1981, 186 L.Ed.2d 1 (2013) (Scalia, J., dissenting); *see also Ferguson v. City of*

---

7. As set out in footnote one, the handbook provides that "Duly authorized personnel of HPU reserve the right to enter student rooms at any time for emergency purposes or for the purpose of maintenance, repair, and inspection for health, safety, or violation of University regulations."

*Charleston*, 532 U.S. 67, 83 & n.20, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes."); *Ferguson*, 532 U.S. at 88, 121 S.Ct. 1281 (Kennedy, J., concurring) ("The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes.").

No such non-investigative motive exists in this case. The officers' entry in this case was conducted to obtain evidence of a crime rather than to maintain discipline, order, or student safety. That is what sets this case apart from *Medlock* as well as the other cases upon which the State relies such as *State v. Hunter*, 831 P.2d 1033 (Utah Ct. App. 1992). In that case a Utah court of appeals upheld a warrantless room-to-room inspection of a dorm housing football players. *Id.* at 1038. That search was conducted after numerous incidents of vandalism and damage that university officials suspected were the result of violations of the alcohol and explosives prohibitions. *Id.* at 1034. The search was instigated by Gary Smith, Director of Housing and Food Services at Utah State University, after yet another report. *Id.* Smith, along with the head custodian, a football coach, and a university police officer (there in case "Smith discovered any problems that he was not able to handle on his own")—ran across stolen university property in plain view in Hunter's room. *Id.* at 1034–35.

The court found the search reasonable under the circumstances of the case in large part because damage was reported on the very morning of the room-to-room search; the university's reasonable measures were necessary to safety. *Id.* at 1036. The *Hunter* court took care to dis-

tinguish *Piazzola* and like cases, where university officials delegated their right to inspect rooms to the police, circumventing traditional restrictions on police activity. *Id.* at 1037-38. Because the special needs doctrine cannot be used to justify the collection of evidence for criminal law enforcement purposes, we turn to the State's argument that the drugs in this case were admissible under the "plain view" doctrine.

## C. The "Plain View" Doctrine

The trial court found that "Officer Pacatte was led by Mrs. Pryor into Mikenzie Rodriguez's and Adrienne Sanchez's dorm room." And, "once inside the dorm room, Officer Pacatte did not have to "touch, move, or manipulate the objects to observe them" and it "was immediately apparent . . . that the items . . . may have been evidence of a crime or contraband." The State argues, based on these facts, that the plain view doctrine applies here: Officer Pacatte had a right to be where he was when he viewed the contraband "in plain view." But we agree with the trial court's conclusion of law: "Although Officer Pacatte observed the evidence lying on the floor of Mikenzie Rodriguez's room, the officer cannot claim that the items were in plain view because he did not have a right to enter Mikenzie Rodriguez's dorm room."

 In certain circumstances a warrantless seizure by police of an item that comes within plain view during their lawful presence in a private area may be reasonable under the Fourth Amendment. *State v. Dobbs*, 323 S.W.3d 184, 187 (Tex. Crim. App. 2010). For a plain-view seizure to be lawful, the officer must have had lawful authority to be in the location from which he viewed the item, and the incriminating nature of the item must be immediately apparent. *Id.* Here, Appellee had an expectation of privacy in her dorm room

and the entry by the police was not justified under "special needs." Though the evidence shows that the officers never received express consent to enter from either student or any school official, the State argues that Nancy Pryor's gesture of walking into the dorm room could reasonably be construed as conveying "consent" to the officers and that she had actual or apparent authority to do so. Assuming Nancy Pryor's gesture of walking into the dorm room could be construed as conveying "consent,"[8] Nancy Pryor had no actual or apparent authority to grant that consent.

### 1. *Actual and Apparent Authority*

 A third party can consent to a search to the detriment of another's privacy interest if the third party has actual authority over the place or thing to be searched. *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010); *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The third party may, in his own right, give valid consent when he and the absent, non-consenting person share "common authority" over the premises or property, or if the third party has some "other sufficient relationship" to the premises or property. *Hubert*, 312 S.W.3d at 561; *Matlock*, 415 U.S. at 170-71, 94 S.Ct. 988. Common authority is shown by mutual use of the property by persons generally having joint access or control for most purposes. *Matlock*, 415 U.S. at 171 n.7, 94 S.Ct. 988. With joint access and control, it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that

one of their number might permit the common area to be searched. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011). In *Matlock*, for instance, the Supreme Court held that a co-tenant's consent is good against the absent, nonconsenting tenant. *Matlock*, 415 U.S. at 175-77, 94 S.Ct. 988 ("Mrs. Graff responded to inquiry at the time of the search that she and respondent occupied the east bedroom together."). And in *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the Court held that a duffle bag co-user's consent is good against the absent, co-user of the bag. In *Georgia v. Randolph*, though, the Court held that consent given by a co-tenant cannot override the objection of another present co-tenant. 547 U.S. at 114, 126 S.Ct. 1515.

 But actual authority is not necessarily a prerequisite for a valid consensual search. If an officer reasonably, though mistakenly, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched, apparent authority exists. The purported consent from the third party can serve to make the search reasonable. *Hubert*, 312 S.W.3d at 561; *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Apparent authority is judged under an objective standard: "Would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Limon*, 340 S.W.3d at 756. Reasonableness hinges on "widely shared social expectations" and "commonly held

---

8. *See Baird v. State*, 398 S.W.3d 220, 229 (Tex. Crim. App. 2013) (discussing penal code definition of consent; "After all, consent cannot be both an 'actual or real' agreement 'after thoughtful consideration' and at the same time only a seeming agreement that 'may or may not be factually valid.' We there-

fore conclude that, read in context, the word 'apparent' as it appears in Section 1.07(a)(11) embraces the first dictionary definition of 'apparent'—assent in fact that, while not communicated expressly, is no less 'clear and manifest to the understanding' for not having been explicitly verbalized.").

understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Randolph*, 547 U.S. at 111, 126 S.Ct. 1515; *State v. Copeland*, 399 S.W.3d 159, 163 (Tex. Crim. App. 2013).

### 2. *No actual authority*

█ The State argues that Nancy Pryor, either as the resident supervisor who physically lives in the residence hall or as a Howard Payne administrator, had common authority over the dorm room—so she had actual authority to consent. But, as the trial court concluded, Nancy Pryor did not have mutual access to and control over the place that was searched, nor did she claim to have such. "In line with *Matlock*, we have stated that, in order for a third person to validly consent to a search, that person must have equal control and equal use of the property searched." *Welch v. State*, 93 S.W.3d 50, 52-53 (Tex. Crim. App. 2002). Just as an individual does not assume the risk that a contractor will invite others into the house simply by requesting the contractor work within the house, a student does not assume the risk that university administrators will invite others—police officers—into the student's dorm room simply by living in a university dorm room pursuant to a contract allowing the university to make health safety inspections. *See Piazzola*, 442 F.2d at 289; *Cohen*, 292 N.Y.S.2d at 709; *McCloskey*, 272 A.2d at 273. Consent was given not to Officer Pacatte or the Brownwood detectives, but to the university landlord, and the latter cannot fragmentize, share or delegate it. *See, Walker*, 143 Cal. App. 4th at 1209, 49 Cal.Rptr.3d 831 (relationship between the University and the student-resident, defendant, is akin to landlord-tenant relationship; fact that security officer said he had consent to search room did not give rise to a reasonable conclusion that he could

agree to a police search of the room on defendant's behalf); *Cohen*, 292 N.Y.S.2d at 709. Otherwise, the housing regulation itself would constitute an unconstitutional attempt to require a student to waive his protection from unreasonable searches and seizures as a condition to his occupancy of a college dormitory room. *See Devers v. S. Univ.*, 712 So.2d 199, 206 (La. Ct. App. 1998) (dorm room rental agreement providing that the "University reserves all rights in connection with assignments of rooms, inspection of rooms with police, and the termination of room occupancy" was prima facie unconstitutional); *Piazzola*, 442 F.2d at 289; *Smyth*, 398 F.Supp. at 788.

Even if HPU, as a private institution, could condition occupancy of its dorm rooms upon a student's waiver of his protection from unreasonable searches and seizures by law enforcement, there was no proof of such a condition before the trial court—the handbook exhibit notwithstanding. We suspect that most private college students would be very surprised indeed to wake up tomorrow to find that, by signing a housing contract allowing administrative searches, they have waived any Fourth Amendment protections from unreasonable search and seizure.

We have only found third parties, without obvious common authority, had actual authority to consent to a search when the practical relationship between the persons was not simply that of landlord/tenant. *See Hubert*, 312 S.W.3d at 564 (The owner of a house had the power to consent to a search of his grandson-defendant's room in that house; the defendant had no proprietary or possessory right other than by the grace of his grandfather.); *Balentine v. State*, 71 S.W.3d 763, 772-73 (Tex. Crim. App. 2002) (The owner of a "rear" house that defendant resided in had the power to consent to a search of the house; the utilities were in the owner's name and he paid them, and

the owner allowed the defendant to occupy the rear house in exchange for cleaning up around the property.); *Patrick v. State*, 906 S.W.2d 481, 490 (Tex. Crim. App. 1995) (The defendant's girlfriend had power to consent to a search of the residence she had shared with the defendant; although the girlfriend had left the premises the night before, she had signed the lease, she was responsible for one-half the utility bills, she told defendant she would return, and she returned several times to pick up personal effects.); *Garcia v. State*, 887 S.W.2d 846, 850-852 (Tex. Crim. App. 1994) (The landlord of a garage apartment rented to the defendant had the power to consent to a search of it; the owner kept some of his personal belongings in the garage and had an agreement with the defendant that he could enter whenever he wished.).[9] But there was no such special relationship in this case. Nancy Pryor did not live in the room. Nancy Pryor did not keep possessions in the room. Nancy Pryor lacked actual authority to consent.

The State cites *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), for the proposition that, if Pryor could summon officers to the hallway outside the dorm room, she could summon them inside.[10] But *Chrisman* is different. In that case, a university officer had placed Overdahl, Chisman's roommate, under lawful arrest, and accompanied him

to his room for the purpose of obtaining identification. *Id.* at 3, 102 S.Ct. 812. The officer remained in the open doorway, leaning against the doorjamb while watching Chrisman and Overdahl. *Id.* at 3, 6, 102 S.Ct. 812. The officer noticed seeds and a small pipe lying on a desk from where he was standing, so he entered the room and examined the items, confirming his belief that they were marijuana and a marijuana pipe. *Id.* at 4, 102 S.Ct. 812. The Supreme Court rejected the notion that the officer needed exigent circumstances to cross the threshold because "[t]he officer had a right to remain literally at Overdahl's elbow at all times" and his "right to custodial control did not evaporate with his choice to hesitate briefly in the doorway rather than at some other vantage point inside the room." *Id.* at 6, 8-9, 102 S.Ct. 812. The Supreme Court stated that "[t]his [was] a classic instance of incriminating evidence found in plain view when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy. The Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances." *Id.* at 9, 102 S.Ct. 812. Comparatively, the officers in this case did not enter for "unrelated but entirely legitimate reasons." They entered to collect evidence they had been told existed.

---

9. Similarly, we have found third parties, without obvious common authority, had enough of a sufficient relationship to a vehicle to consent to a search only where the practical relationship between the persons was not simply that of driver/passenger. *Welch v. State*, 93 S.W.3d 50, 53 (Tex. Crim. App. 2002) (The passenger in the defendant's truck had the power to consent to a search of the defendant's truck; although the arrested defendant had refused to consent to the search, when she requested that the truck be turned over to her passenger, the passenger's status rose to one having joint access and control over the truck); *Maxwell*, 73 S.W.3d at 282 (A tractor-

trailer rig driver had the power to consent to the search of the defendant's rig; even though the defendant owner of the rig was present and had a superior privacy interest in the rig, the driver's employment gave the driver mutual use and control of the rig while he was driving.).

10. State's Br. 58 ("The Supreme Court found distinctions between the common hallway, the threshold, and inside the [dorm] room to be of no legal significance as long as the officer had a right to be in any of these locations.").

### 3. *No apparent authority*

■ The State points to the following facts as supporting a "reasonable belief" that Nancy Pryor had authority (and so had "apparent authority") to consent to a police search: (1) the housing agreement—allowing health and safety inspections; (2) the student handbook's emphasis on cooperation with police; (3) the fact that Howard Payne police were called first; (4) the university's obligation to maintain the facility; (5) the contract to occupy; and (6) the job description of the resident director contained in the student handbook. But, as Appellee points out, the record is devoid of evidence that the officers knew about the student handbook or the housing agreement and contract; the record is not developed on this issue.

In *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Supreme Court held that a night hotel clerk could not validly consent to a search of a hotel guest's room. *Stoner*—like the *Piazzola* case relied on by the court of appeals—was decided before the doctrine of "apparent authority" came to life—at least in Supreme Court law. But when the Court did adopt the doctrine of "apparent authority," in *Illinois v. Rodriguez*, the Court made clear that the doctrine is consistent with *Stoner* because the *Stoner* court had noted that " 'there is nothing in the record to indicate that the police had *any basis whatsoever to believe that* the night clerk had been authorized by the petitioner to permit the police to search the petitioner's room.' " 497 U.S. at 187-88, 110 S.Ct. 2793 (quoting *Stoner*, 376 U.S. at 489, 84 S.Ct. 889); *see McNairy v. State*, 835 S.W.2d 101, 105 (Tex. Crim. App. 1991), abrogated in part on other grounds by *Turrubiate v. State*, 399 S.W.3d 147 (Tex. Crim. App. 2013) (adhering to the general rule that a landlord cannot normally give effective consent to allow a search of a tenant's premises). The same can be said here. As the court of appeals aptly put it: "The State provided no evidence of apparent authority." *Rodriguez*, —— S.W.3d at ——, 2015 WL 5714548, at *7: Nancy Pryor was not a homeowner making a 911 call requesting immediate assistance because of an emergency. *Johnson v. State*, 226 S.W.3d 439, 444 (Tex. Crim. App. 2007). She was a presumptively reliable citizen informant. As Officer Pacatte acknowledged, "It would have been easy enough to obtain a warrant."

## VI. Conclusion

To be sure, we are not asked to weigh in on the legality of the initial search by the RAs pursuant to the student housing agreement. Rather, we are asked to decide whether a subsequent search by law enforcement at the implied invitation of university officials violated the Fourth Amendment. We hold, as the court of appeals did, that Appellee retained an expectation of privacy in her dorm room even after it had been searched by private citizens and that the subsequent entry and search by law enforcement did not fall within any recognized exceptions to the warrant requirement. Consequently, we affirm the Court of Appeals.

Keller, P.J., filed a dissenting opinion.

Keasler, J., did not participate.

Keller, P.J., filed a dissenting opinion.

A valid health-inspection search of a dorm room by agents of a private university uncovered contraband—illegal drugs. A university official called the university police, who came and seized the contraband. The student handbook of the university provides that duly authorized personnel of the university reserve the right to enter student rooms "at any time" for certain purposes, including "inspection for health,

safety, or violation of University regulations." Other passages in the university handbook highlight the possession of drugs as a violation of university regulations and the university's policy of not tolerating drugs on campus. I would hold that the seizure did not violate the Fourth Amendment.

This case is similar to *Medlock v. Trustees of Indiana University*,[1] and any differences favor the State. In *Medlock*, the Indiana University handbook authorized health and safety inspections of dorm rooms by student inspectors.[2] The handbook required at least 24 hours written notice to the student before an inspection occurred.[3] During an authorized inspection of Medlock's room, student inspectors found a clear plastic tube that appeared to contain marijuana.[4] One of the student inspectors called the Indiana University Police Department.[5] The officers in this police department were real police officers, with the same powers as police officers employed by cities and towns.[6] A university police officer—Christopher King—entered the room, looked at the tube, smelled marijuana, and left with the tube.[7] The student inspectors continued their inspection and discovered a large marijuana plant in the closet.[8] Officer King was summoned again, and he looked in the closet "and found himself face to face with a six-foot-high-marijuana plant."[9] At that point,

Officer King left to get a warrant to search the room for more contraband and posted another police officer in the room to make sure that no one moved or destroyed anything that might be contraband.[10]

Medlock was ultimately expelled from the school.[11] He filed a federal civil-rights lawsuit alleging, among other things, a Fourth Amendment violation.[12] Although the Seventh Circuit observed that the Fourth Amendment's exclusionary rule did not apply to student disciplinary proceedings, it stated that a violation of the Fourth Amendment would have entitled the student to money damages.[13] "But," the Seventh Circuit concluded, "there was no violation."[14]

The court concluded that Medlock had contractually agreed to health inspections by university agents as a condition of living in his dorm room:

> Medlock had consented in advance, as a condition of being allowed to live in the dormitory, to have his room searched for contraband and other evidence of violation of the health and safety code. He could have lived off campus and thus have avoided being governed by the code. He chose to trade some privacy for a dorm room.[15]

The student handbook did not purport to

1. 738 F.3d 867 (7th Cir. 2013).

2. *Id.* at 869.

3. *Id.*

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.* at 869-70.

8. *Id.* at 870.

9. *Id.*

10. *Id.*

11. *Id.* He was later readmitted. *Id.*

12. *Id.* at 871.

13. *Id.* at 872.

14. *Id.*

15. *Id.* Alternatively, the court held that the search was a lawful regulatory search. *Id.*

authorize searches by the police.[16] Nevertheless, the court found that Officer King's seizure of contraband did not violate the Fourth Amendment. First, relying in part on *United States v. Jacobsen*,[17] the court found that Medlock's expectation of privacy had already been frustrated by the search conducted by the student inspectors:

> What King saw the student inspectors had seen. The intrusion on Medlock's privacy was complete before King entered. And if this is wrong and a third person's glimpse of the incriminating scene could be thought an incremental intrusion, liability would be blocked by the venerable principle of *de minimis non curat lex*, which has been held applicable to a variety of constitutional settings.[18]

Second, the court stated that "reasonableness is the touchstone of the Fourth Amendment," and that it was reasonable not to expect the student inspectors to seize the contraband themselves:

> [O]fficer King was acting reasonably in backing up the student inspectors. They had entered Medlock's dorm room lawfully and a plain-view search had revealed marijuana. What were they to do? Remove the suspected marijuana

from the room? But they are just students, and the university administration may not want its student inspectors to be seen in the hallways of the dorm carrying quantities of illegal drugs (especially a six-foot-tall marijuana plant) and drug paraphernalia, and may want their suspicions of possible criminal activity confirmed or dispelled forthwith by a police officer. It thus was sensible of the students to summon a university police officer to confirm their suspicion that they had found marijuana and other contraband and to remove the stuff.[19]

The Court says that the officers in *Medlock* "merely maintained the status quo while law enforcement secured a search warrant in good faith." I disagree with that conclusion for two reasons. First, Officer King entered the dorm room without a warrant, and he did so, not just once, but twice. Second, before a warrant was obtained, the officer seized the tube of marijuana and carried it away with him.

There are cases in which a court held that the Fourth Amendment was violated by an entry by law enforcement officers who were invited into the residence by a landlord after the landlord had discovered contraband.[20] However, in at least two respects, the facts of the present case are

---

**16.** *Id.* at 873.

**17.** 466 U.S. 109, 120-21, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

**18.** *Medlock*, 738 F.3d at 873.

**19.** *Id.*

**20.** *But see State v. Johnson*, 110 Idaho 516, 521, 716 P.2d 1288, 1293 (1986) ("In the instant case, the suspected contraband was *not* turned over to the authorities; instead the landlord *invited* the officer to enter a private dwelling to observe the contraband first-hand. In this case, the suspected contraband was *not* in plain view; *and the landlord had neither personally seized nor delivered it to the police.* The *officer* had to *enter* the private dwelling in

order to see it. The fact that the Fourth Amendment does not reach the landlord does not mean that the officer, a government official, is also immune from its sanctions simply because he accompanied the landlord.") (emphasis in original; ellipsis omitted); *State v. Wright*, 221 N.J. 456, 476-77, 114 A.3d 340, 352 (2015); *People v. Brewer*, 690 P.2d 860, 862-63 (Colo. 1984). *See also Chapman v. United States*, 365 U.S. 610, 617, 81 S.Ct. 776 ("But it is clear that, before the officers made the forcible entry, the landlord did not know that the premises were being used for the [illegal] manufacture of liquor, nor had he exercised his statutory option to forfeit the tenancy for such a cause.").

more favorable to the State than the facts in *Medlock* and these other cases.

First, Howard Payne University (HPU) is private university. For this reason, I must disagree with the Court's contention that it would be unconstitutional for the university to require a student to give up Fourth-Amendment privacy rights as a condition of living in its dorms. HPU is not a state actor.[21] If it wishes to require students who live in its dorms to give up some privacy rights under the Fourth Amendment, it has the right to do so. Although the student handbook required certain classes of students to live in on-campus housing,[22] a student could have chosen to attend a different university. A student would just have to decide whether the educational value at HPU was worth any ensuing sacrifices in privacy that the university required while living in its dorms.

Although campus police officers may sometimes be state agents for Fourth Amendment purposes, because they have full authority to act as police officers under the law, they are also employees of the university.[23] And that leads to the second aspect of this case that favors the State: The student handbook conferred broad authority on Howard Payne University personnel to enter rooms to inspect for a violation of university regulations:

> Duly authorized personnel of HPU reserve the right to enter student rooms at any time for emergency purposes or for the purpose of maintenance, repair, and inspection for health, safety, or violation of University regulations.

> Students are expected to maintain neat and orderly rooms. Periodically throughout the semester, Resident Directors and/or Resident Assistants will conduct health, hygiene, safety, and security checks in residence hall rooms.

As in *Medlock*, student inspectors were given authority to conduct inspection. But, in addition to that authority, the handbook also authorized "duly authorized personal of HPU" to "enter student rooms at any time" to inspect for a "violation of University regulations."

Needless to say, possessing illegal drugs was violation of university regulations. Howard Payne made clear in the student handbook that illegal drugs would not be tolerated on campus or off campus and that the university would fully cooperate with law enforcement on such matters:

> Howard Payne University prohibits the use of illegal drugs both on and off campus because they are detrimental to the physical, psychological, social, and spiritual well being of the individual. For the same reasons, the use or possession of alcohol on campus, at a University-sponsored event or trip, or in any manner that violates municipal, county, state, or federal law is prohibited. Abuses of substances also impede the student's academic progress and thus work

---

21. This means that, while the student inspectors in *Medlock* were state agents because the university in *Medlock* was a public university, 738 F.3d at 871, the same is not true in the present case.

22. This requirement applied to full-time, unmarried students who were between ages 17 and 22 who were not living with parents and who had not yet completed four full semesters or 60 credit hours.

23. *See* TEX. EDUC. CODE § 51.203. The District of Columbia Court of Appeals has held that university police officers do not always act as state agents, and that they may be private actors when they serve as mere adjuncts to the actions of an administrator of a private university. *Limpuangthip v. United States*, 932 A.2d 1137, 1142-47 (D.C. App. 2007). For the reasons given below, I need not resolve whether HPU Officer Pacatte acted as a state agent or a mere agent of HPU.

against the very purpose of the University. HPU intends to cooperate fully with the Federal Government, the State of Texas, and local authorities in the war against drug and alcohol abuse.

\* \* \*

The University expects its students to obey the law. Therefore, a violation of alcohol or drug laws while admitted to the University, wherever that violation occurs, is a violation of the University's Student Conduct Code. Further, it is a violation of the University's expectations for a student to drink, possess, or be impaired by drinking, alcoholic beverages, or to possess, use, or be under the influence of, illegal drugs or non-prescription hallucinatory drugs, on campus or at any event sponsored by the University or by a University-approved student organization.

Further, under the student handbook, the university reserved the right to require students to submit to drug testing:

> Designated University officials reserve the right to require a student to show proof of a drug-free condition including drug testing whenever such officials suspect or have reasons to believe that a student might be engaging in drug use on or off campus. Reasonable suspicion for testing is to be determined by the sole discretion of University officials.

"Possession of drug paraphernalia" was one of many listed, nonexclusive grounds for requiring drug testing. The university also reserved "the right to use canine detection services whenever drugs are suspected on University property and are undetected by other means, as well as a deterrent to drug possession or use among students."

Once the student inspectors discovered what appeared to be illegal drugs and drug paraphernalia, the clause in the student handbook regarding violations of university regulations became operable, as well as the university prohibition against drug use and the university's avowed intent to cooperate with law enforcement. Howard Payne police officers, as employees of the university, were thus authorized to enter the room to seize the suspected drugs and drug paraphernalia found by the student inspectors.[24]

I respectfully dissent.

---

24. Whether a Howard Payne police officer could have conduct a physical search beyond what the student inspectors found, without a warrant, need not be decided here.