

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-23-01087-CR

The **STATE** of Texas,
Appellant

v.

Matthew D. **MARTIN**,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2022CR7361
Honorable Frank J. Castro, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
               Irene Rios, Justice
               Lori Massey Brissette, Justice

Delivered and Filed: August 28, 2025

AFFIRMED

Appellee Matthew D. Martin was charged with one count of stalking and thirty-nine counts of possession of child pornography. *See* TEX. PENAL CODE ANN. §§ 42.07; 43.26; 43.262. He moved to suppress evidence discovered from searches of his cell phone conducted by his ex-girlfriend and later by the police, first without a warrant and then with a warrant. The motion was referred to an associate judge, who held a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978). Thereafter, the associate judge made findings of facts and conclusions of law, reaching

the ultimate conclusion that the challenged evidence should be suppressed. The trial court adopted the associate judge's findings and conclusions and issued an order suppressing all evidence alleged to constitute child pornography obtained from searches of Martin's cell phone. The State then appealed, and we stayed trial proceedings pending resolution of this appeal. *See* TEX. CODE CRIM. PROC. art. 44.01(a), (e). We now affirm the trial court's suppression order and lift the stay.

## I. BACKGROUND

Martin's cell phone was first searched by his ex-girlfriend, Ashley Pacheco. In this appeal, Martin broadly contends that Pacheco did not have effective consent to take or access his phone or actual or apparent authority to consent to a later police search of his phone. The State disagrees and argues also that the police officers acted reasonably and in good faith when they searched the phone pursuant to a warrant. These matters were explored at a *Franks* hearing. *See Franks*, 438 U.S. at 171–72 (allowing evidentiary hearing for defendant to challenge truthfulness of factual statements made in search warrant affidavit); *see also Gonzales v. State*, 481 S.W.3d 300, 311 (Tex. App.—San Antonio 2015, no pet.) (extending *Franks* to allow challenges to material omissions). Because our analysis requires a close review of the evidence adduced at the *Franks* hearing, we summarize it in detail.

## 1. The *Franks* Hearing

Pacheco did not testify at the hearing, but her statements were before the trial court after it admitted videos recorded by the police.[1]

### A. The Substation Video

The first video shows that, on July 12, 2021, Pacheco arrived at a police substation with Brianne Heywood ("Ms. Heywood") and met with San Antonio Police Officers Wade McLeroy

---

[1] Additionally, transcriptions of the videos prepared by Martin were admitted. We have reviewed the videos and the transcriptions, and determine that the transcriptions are materially accurate, and we quote them in this opinion.

and Bryce Heywood ("Officer Heywood"). Ms. Heywood and Officer Heywood were married at that time; Ms. Heywood is Martin's ex-wife.

The video, captured by Officer McLeroy's body-worn camera, begins with the participants discussing a cell phone, which Pacheco states is Martin's phone. The camera then captures the following conversation:

PACHECO: It's the phone that I found in the safe.

OFFICER HEYWOOD: That when they were living together, she found it there, that when they broke up she still had actually had it.

PACHECO: I actually had it just because.

OFFICER HEYWOOD: And then, because of the tracker, tracker, right? Why did you keep it again?

PACHECO: Why did I keep the phone?

OFFICER HEYWOOD: Just cus [sic]?

PACHECO: Just cus [sic] I found because there's a lot of girls in there.

MS. HEYWOOD: Yeah, there's a lot of things going on that made her suspicious.

PACHECO: A lot of stuff.

OFFICER HEYWOOD: And then you got into it today because of the tracker?

PACHECO: The tracker. My cousin is also a police officer. I went to his house to show him, and, because I didn't want to look for it at my apartment, because I don't know where this guy is. So I went to my cousin's house to help me find the tracker on my truck if it was there or not. And then that's when we found the tracker, and that's when I got back into the phone.

Over the course of the next three hours, Pacheco told the police how she came to have Martin's phone and why she searched it. She stated that she lived with Martin in his house for two or three years and was engaged to marry him. Then, on January 17, 2021, she found Martin's phone in a locked safe in his home. Pacheco also kept her personal items in the safe. On Martin's phone,

Pacheco found pictures of adult women.  She suspected Martin of infidelity and broke up with him.  The next day, Pacheco moved out and kept Martin's phone.

In the video Pacheco asks about stealing, and the other participants respond as follows:

PACHECO: Am I going to be in trouble for stealing his phone though?

MS. HEYWOOD: No.

OFFICER HEYWOOD: No.

OFFICER MCLEROY: He left it there, right.

MS. HEYWOOD: You live together, right?  You were married.

PACHECO: Oh yeah, we were engaged.

OFFICER HEYWOOD: It's both of your guys' property.

Pacheco also stated at the substation that she told Martin she had destroyed his phone:

OFFICER MCLEROY: He doesn't know you have the cell phone right?

PACHECO: Um, I think he has an idea but he thinks, I told him I destroyed it.

Pacheco explained that in July 2021, Pacheco accessed Martin's phone to "cross reference certain things that he said" because Martin was "trying to get me back."  She stated to police that she "got in and saw an email for a tracking device."  On July 12, 2021, the day the substation video was recorded, Pacheco went to her cousin's house, seeking his help to locate the tracking device.  Pacheco and her cousin found the device on her truck.  Then, according to Pacheco,

after we found the tracker I said this is there's something else there's got to be more because why is he tracking me I don't go anywhere.  I have nothing to hide. What is so important?  Why are you tracking and so I turn the phone on and I pulled up I was telling him about this zip extractor whatever thing and that's when I pulled it up and I opened the file[.]

Later in the conversation, Pacheco states: "I turned the phone back on because I wanted to find what else is there because there's more.  It's almost like a gut feeling there's got to be more than

- 4 -

27 women." Pacheco explained that she opened an application on Martin's phone called "Zip Extractor" and "went through like two or three" files. According to Pacheco, those files showed "little girls," and Pacheco confirmed to Officer McLeroy that these pictures show genitalia. *See* TEX. PENAL CODE ANN. § 43.262(b)(1) (listing as element of offense that visual material "depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created").

After finding these pictures at her cousin's home, Pacheco met with Ms. Heywood and showed her the phone. Ms. Heywood stated on the video that she "only saw like one image." The two women then went to the police substation. Toward the beginning of the video, Pacheco hands the phone to Officer McLeroy. The video shows that the phone is turned on and unlocked. On the video, Pacheco affirms that the phone has no passcode. The video shows Officer McLeroy scrolling through pictures on the phone for approximately five minutes. Later, he states on the video: "I looked through it. I didn't see any genitalia on it. I didn't get into it too deep."

### B. Pacheco's Recorded Statement

The next day, Pacheco met with San Antonio Police Detectives Rob Lopez and George Segura to make a statement. Pacheco's statement was video recorded.

On the video, Pacheco states that she and Martin had been living together in Martin's home for almost two years, and they shared a safe in which they both kept important items. Martin owned the safe and had given Pacheco the combination after she had moved in. In December 2020, they became engaged. After becoming engaged, Pacheco asked Martin for his government identification to add him to her insurance. Martin went to the safe. Later, Pacheco went to check on him and found Martin near the safe, with photos and cards from Martin's past relationships on

the floor.  Pacheco asked Martin to remove those items "that do[] not need to be there."  Martin responded that he would take care of it before departing on a scheduled trip.

According to Pacheco, right before Martin left on his trip,

[H]e was looking for something else and I went to help him look and he flipped out. . . . So, I'm like, what are you trying to hide?  Um, [s]o, after he left, I went, opened up the safe with the combination, and started throwing away all the stuff that didn't need to be there, the pictures, the letters, all the stuff from the exes, and even back to [Ms. Heywood], her — his ex-wife.  And when I was putting a stack of stuff that should be in there back into the safe, I put it on the top shelf and something fell off and fell.

. . .

Well, I'm going to put it back, so I grab the phone, found out that it was a phone, grabbed it and I'm like oh, why would he have his old phone?  We just got new phones a couple years ago.  So, I open it up and I find that he had ongoing relationships, not just like an oops, but ongoing other relationships for years.  Some of them started before me, some of them after.

. . .

So, I move out.  I keep the phone, I move out.

In the six months immediately after Pacheco moved out, Martin sent Pacheco emails apologizing and seeking to reconcile.  Martin also threatened Pacheco by email, writing, according to Pacheco, "Don't make me come find you," and,  "You need to respond or else I'm going to find you."  Pacheco considered reconciling, stating to the detectives,  "So, you start toying with the idea maybe.  And something in my gut is like nothing, no, there's still something, there's still something.  So, July 3rd, um, I pulled out the phone and I started going through it again."

Pacheco explains on the video how, on July 3, 2021, she turned on the phone, and connected it to the internet.  The phone updated with new emails, including one showing a receipt for a tracking device.  Later that day, Pacheco opened up the Zip Extractor application on Martin's

phone. She could see files within the application but was not able to open them. On July 10, 2021, Martin went to Pacheco's residence. According to Pacheco,

> He said something about tracking, me tracking him, which he used to share his location with me, but since I stopped, since I would not take his calls or texts anymore, um, he turned his location off so I couldn't see where he was.
>
> . . .
>
> Um, but then again that receipt is still there, and I'm like but why, why would that be there?

On July 12, 2021, Pacheco's cousin, a former peace officer, contacted her, which prompted Pacheco to ask for his help in searching for the tracking device. Pacheco drove to her cousin's home, and, according to Pacheco, "for whatever reason took that phone with me." Pacheco and her cousin found the tracking device hidden in the bumper of her truck. Pacheco stated to the detectives: "Then that day that I found that tracker I pulled that Zip Extractor app up and I went into another area of that thing and I found there's files, hundreds, hundreds of files." Pacheco explained that she searched the phone because she wanted to understand why Martin was expending so much effort in his attempt to reconcile with her. As Pacheco stated, "I felt like there was a reason why, and I felt like that phone was it." Pacheco then described the photos that she saw in the phone; next, her meeting with Ms. Heywood; and, after that, her meeting with police at the substation the day before. Pacheco's statements to the detectives on these matters matched her earlier statements at the substation.

Over the course of her interview, Pacheco provided the detectives with further information about Martin's phone. Pacheco confirmed that the phone she found in the safe was "absolutely his phone, his old phone," and she stated that the phone was not passcode protected. Additionally, Pacheco stated that Martin let her use his phone but was "weird with it," and she affirmed he was

"possessive of it." She stated that she never borrowed the phone and, if she used it, "[h]e would be right there." Pacheco gave as an example:

> [W]e took the girls, his girls to some Christmas like lights in Austin, the Trail of Lights. Um, and I couldn't, I think my phone was dead or something I was like give me your phone because they were doing something cute. I said hurry up, give me your phone. He's like, why? I'm like, I want to take a picture there. Never mind, just never mind. Because he was always weird.

Pacheco also stated that Martin had a new phone, which was passcode protected and, additionally, that she had access to his account with his cell phone provider.

On the video, the detectives and Pacheco discuss whether Martin believed the phone was destroyed:.

> DETECTIVE LOPEZ: Now he believes you threw it away, you got rid of it. That's his belief?
>
> PACHECO: That's, that's what he's making me believe that I believe, yes. That's the [inaudible]. I believe that he thinks that I threw it away, but he also brings up the phone.
>
> . . .
>
> DETECTIVE LOPEZ: What, like what does he say?
>
> PACHECO: Um, well, he started going to a doctor after all this happened and apparently the doctor told him that me going through that phone is being a . . .
>
> . . .
>
> PACHECO: Unhealthy detective. And he didn't just say that once or twice. I'm an unhealthy detective if I continue to look through that phone. I'm doing no service to myself. I'm just drawing out this hurt and pain and the cheating and not being able to move forward with it in a healthy manner. I just sit there and study this negative stuff. And he said that, he told the doctor at one point that I, I broke the phone it's gone, and the doctor questioned him if, well, do you believe she actually did it? And he told the doctor well yeah, Ashley wouldn't lie about that. Who says that? Who says that kind of stuff?
>
> DETECTIVE SEGURA: He shared that conversation with you? The conversation with the doctor?

PACHECO: He was telling me that about his conversation with the doctor.

DETECTIVE SEGURA: And when did that take place?

PACHECO: February?

DETECTIVE LOPEZ: That doesn't sound right.

PACHECO: Well, I mean anything, he's fishing.

DETECTIVE LOPEZ: Yeah. That's kind of what I get.

PACHECO: He's fishing for information.

DETECTIVE LOPEZ: Hm, yeah. Okay. I just wanted to make sure that that's what he's assuming or thinking, that the phone is no longer there.

PACHECO: I think he doesn't know what to believe.

## C. Ms. Heywood's Recorded Statement

A third video admitted into evidence at the *Franks* hearing depicts an interview of Ms. Heywood conducted the following day, July 14, 2021, by San Antonio Police Detective Carlos Reyes and Detective Lopez. In her recorded statement, Ms. Heywood repeats information Pacheco told her two days earlier, after discovering the photos on Martin's phone. Ms. Heywood confirmed the timeline for the detectives: Pacheco found the phone in the safe in January 2021; moved out that same month; and located the tracking device and found photos in the phone on July 12, 2021. Generally, Ms. Heywood narrated an abbreviated version of events that coincides in important details with the version Pacheco gave in her statement. As to destruction of the phone, the video of Ms. Heywood's interview shows the following:

MS. HEYWOOD: [Pacheco] had told [Martin] that she destroyed [the phone]. And as far as she knew, he didn't —

DETECTIVE REYES: So he knows that she has the phone?

. . .

MS. HEYWOOD: He knows she has the phone.  I asked her if he ever asked for it back or anything like that.  And she said no, because I told him, I threw it out.  I destroyed it back in, back —

Detective Reyes interrupted Ms. Heywood, and the interview moved on to a different topic.

During the interview, Ms. Heywood described three photos she reviewed on the phone; however, her review of the phone was not as extensive, and the photos she reviewed were not as explicit, as those Pacheco described in her statement.

**D.  The Warrant Affidavit and the Search Warrant**

Detective Reyes, who participated only in Ms. Heywood's interview, completed a warrant affidavit, which he presented to a district judge on July 15, 2021, the day after Ms. Heywood's interview.  His affidavit states:

> On July, 13th, 2021: Det. G. Segura #2200 and Det. R. Lopez #2429 met the reporting person at her residence to get her statement and obtain further information on the case.  During the conversation with the reporting person, Det. Segura and Det. Lopez were informed that the reporting person and the Defendant were in a dating relationship and had been living together for approximately 2 years.  The reporting person stated the cellular phone was found in a safe she shared with the Defendant where they both kept important items stored and was accessible to both the reporting person and the Defendant.

> The reporting person stated that while she was taking out items from the safe she shared with the Defendant, she located the listed cellular phone.  The reporting person stated the listed cellular phone is the one the Defendant used before he purchased a new cellular phone but recognized the cellular phone as belonging to the Defendant.  The reporting person stated she began to look through the listed cellular phone, she discovered several large files, when the files were opened she found more files.  The reporting person described the open file as having "hundreds and hundreds of files" on the listed phone.  The reporting person stated she opened one of the files.  The file she opened contained images of very young girls who were posing in the nude and performing sexual acts on themselves. . . .

> On July, 14th 2021: Det. R Lopez #2429 and your affiant met with a witness at her residence where we obtained a statement.  The witness is the Defendant[']s ex-wife and mother of their two daughters.  The witness stated the reporting person called her upset and needing to talk to her. The witness stated the reporting person drove to the witness['s] home to meet and talk. . . .  The witness stated the reporting person, who was clearly upset, placed a cellular phone in front of her and told her to tap on

any of the files. The witness said the file that opened showed a young female child in what she thought was a costume. . . . On the third photo of the young girl, she was nude from the waist up. . . . The witness stated she did not open any other files and asked the reporting person why she had the phone with the photos. The witness stated the reporting person explained to her how she came to have the cellular phone and the owner of the cellular phone was the Defendant.

The same day that Detective Reyes presented his warrant affidavit, a district judge signed a search warrant, authorizing a forensic search of the phone.

### E. Martin's Testimony

Evidence from the *Franks* hearing also consists of testimony before the court. First to testify was Martin. Martin testified that Pacheco lived with him at his residence, and Martin was the sole owner of the home. Martin and Pacheco became engaged in December 2020, but were never married and never held themselves out as common law married. Consistent with Pacheco's statement, Martin testified that Pacheco had access to the safe where she found the phone and that she kept her personal items in the safe.

Martin testified that he purchased the cell phone found in the safe in 2016, and that he never relinquished ownership and never gave anyone consent to possess the phone. However, inconsistent with Pacheco's testimony, Martin testified that the phone was password protected. He further testified that he never gave Pacheco permission to unlock the phone or consent to take the phone or search it. Martin testified that he kept a password book hidden in his office and that he believed Pacheco was able to unlock his phone by locating this book. Additionally, he testified that when he was arrested, his new phone was seized, and the police were able to unlock it by entering its password. Martin acknowledged that he would allow Pacheco to access his phone for certain purposes, such as taking pictures. While doing so, he would open the phone and hand it to her. He also testified that he and Pacheco shared an account with their cell phone provider.

According to Martin, he first learned that Pacheco accessed his phone on January 17, 2021, and he learned that she took his phone after he returned from his trip a few days later. When asked what Pacheco was doing with the phone, Martin responded that she "was screenshotting images of me and another woman and taking video of me and that other woman and sending it to me." Martin told Pacheco that she did not have permission to access his phone and that he did not approve of what she was doing. Martin also testified that Pacheco told him during the first week of February 2021, that she had destroyed the phone. According to Martin, he and Pacheco saw a counselor together in February 2021. Martin was asked:

Q. And while seeing that counselor, you discussed with this counselor [Pacheco]'s destruction of the phone or her statement that she had destroyed the phone?

A. Yes.

Q. Did you at any point tell the therapist that you believed that [Pacheco] would not lie if she said that she destroyed the phone?

A. Well, like I said, based on what he was telling me, he was saying, you know, Matt, she's telling me she didn't destroy the phone. He said, so at this point what we have to do is try and get her to stop sending you the images that she screenshotted from the phone. And he was like, but it's my belief she destroyed the phone. I believed the counselor so —

Martin testified that he and Pacheco explored a potential reconciliation over the six months that followed the breakup, and they maintained communication. Martin also acknowledged that he "shared [his] location via iPhone" with Pacheco at some point during this time. Additionally, he believed that Pacheco recharged his phone during this time because it was incapable of holding a charge for so long.

### F. Officer McLeroy's Testimony

Officer McLeroy testified about events at the substation on July 12, 2021. He stated that Pacheco came to the substation and explained: she found photos of Martin and another woman on

his phone in January 2021; she left and "had the phone with her;" Martin tried to reconcile with her; and she "got back" into the phone to verify statements Martin was making against those he had made previously. Officer McLeroy then recounted Pacheco's statements regarding finding a tracking device, locating an application on Martin's phone, and discovering pictures that appeared to be child pornography.

Portions of the substation video were then played. Officer McLeroy narrated that Pacheco opened up a file, and Officer McLeroy took possession of the phone to see if probable cause existed to seize the phone or at least proceed with writing a report. Officer McLeroy did not need a passcode to access the contents of the phone. He reviewed several pictures and determined that he had enough to write a report, such that detectives could then pursue a warrant. Officer McLeroy testified he believed his authority to look through the phone arose because he understood that Pacheco and Martin were common law married, that the phone was community property, and that Pacheco had allowed him to look through the phone. According to Officer McLeroy: "If it's common law property — if they live together and it's property that they shared in their house, no, I do not need a warrant." Officer McLeroy explained his understanding of common law marriage: "[I]f you reside together for a length of time — I don't think it's stated as far as how long you need to live together — you have a sexual relationship, you're pretty much common law married." Officer McLeroy acknowledged that he was unaware of a requirement for common law marriage that the couple consider themselves and announce themselves married. *See* TEX. FAM. CODE ANN. § 2.401(a)(2) (informal marriage may be proved by evidence that "the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married."). Officer McLeroy asserted that Detective Reyes never contacted him in connection with the preparation of a warrant.

### G. Detective Reyes's Testimony

Last, Detective Reyes testified. In July 2021, Detective Reyes was assigned to investigate cyber crimes. He was off duty on the day Pacheco made her report at the substation and the next day when she made her recorded statement. He returned to work the following day, and Detectives Segura and Lopez filled him in on their interview with Pacheco from the previous day. Detective Reyes "watched just about all of" Pacheco's recorded statement, and then he interviewed Ms. Heywood. Following his interview, Detective Reyes determined that the phone "may contain child pornography;" he testified: "The image that [Ms. Heywood] described to me did seem like it would — it was enough probable cause to get a search warrant for the phone."

Detective Reyes returned to his office and drafted his warrant affidavit. According to Detective Reyes, "I went strictly with information I had firsthand which is [Ms. Heywood] and Ms. Pacheco's interview." Detective Reyes affirmed that he never spoke with Officer McLeroy or reviewed video from Officer McLeroy's body-worn camera. Further, Detective Reyes testified that he was unaware prior to writing his affidavit that the substation video existed. He explained: "I don't think I had access to [the substation video] at the time. It wasn't on the computer so I don't know if she had given another statement."

Defense counsel questioned Detective Reyes:

Q. Now, the manner in which this phone is found or turned over, isn't that a matter of concern also in your investigation?

A. Yes, sir.

Q. Why is that?

A. If it was obtained illegally.

Q. How? Elaborate, please.

A. So according to Ms. Pacheco the phone was in a house that she shared with the defendant in a safe that she shared with the defendant. So she had access to everything and the phone is there. It's no different than if it was laid on the coffee table. She still had access to it. The phone was not locked in any way. So anybody who picked it up could have tapped on it and opened it.

Now, if Ms. Pacheco didn't live in that house, she was just dating and — and she forced her way in, somehow got into the safe by manipulating the lock and took the phone, then that would have been an illegal way of receiving the phone.

. . .

Q. Okay. Were you aware that at the time that Ms. Pacheco got possession of the phone, she had broken up with the defendant?

A. I didn't know that until later.

Q. Okay. And were you aware that she had left the house and they broke up, basically, when she took that phone.

A. I think later on as the inves- — when I first found out that the phone did have child porn, that's when I was aware of the timeline. And that she had moved out and took the phone with her.

Q. How did you find that out?

A. After I found out that there was actual evidence on the phone, that's when I began to do a more detailed interview with her and the timeline of when she got the phone, how she got the phone and stuff like that.

Q. Is that — you're talking about timelines after you got the warrant?

A. Yes.

Relatedly, Detective Reyes affirmed to the prosecutor that he did not have concerns "with regards to the time frame in which the phone was in [Pacheco]'s hands or anyone else's hands."

The prosecutor followed up:

Q. And why not?

A. Because we weren't sure if a crime had been committed. All we had was two people saying that they thought they saw something. But until I could determine that a crime had been committed, I need — first I need to find out if the device had evidence. Once it had evidence, then I could start my investigation. Doing the

timeline, who had custody of the phone, for how long, who it belonged to. But until I have proof that there was an actual crime, there wasn't a lot to do.

Q. So would the time frame, in which Ashley Pacheco had the phone, had been pertinent to you at the time you began your affidavit for the search warrant?

A. No.

Q. Okay.

A. Whether she had the phone for one day, six months, eight years doesn't change the evidence that was on the phone 'cause it's all digital.

According to Detective Reyes, "[B]efore the first warrant. The timeline almost seemed like it had all happened at that past couple of days." Defense counsel followed up:

Q. Same day?

A. Yeah.

Q. I noticed in your affidavit that there's no reference to any timeline of six or seven months.

A. Correct.

Q. Okay. Had you known from any of the detectives that there was a timeline where Ms. Pacheco breaks up with my client, leaves the house, takes the phone at that time and she leaves the house? Wouldn't you think that that would have been important in your analysis before you prepare the affidavit?

A. Hindsight, I don't think so. I think I still would have applied for the search warrant.

Q. Is it your testimony then that because somebody lives with someone and they have access to their things in their home, that they can take their phone and get into it?

A. Sure.

Q. And leave with the phone as well?

A. Yeah.

Q. There wouldn't be any consent from the person before they get into their phone?

A. No.

Q. Okay.

A. If it was locked, yeah, you would need consent. But if it's property that you've been sharing with the person for the past two years, no.

. . .

Q. Okay. Okay. And if she said she took it without her [sic] consent, what would that have done?

A. Nothing.

Q. Oh, it still didn't matter?

A. It still wouldn't matter. She still had access to his phone, to his property, to everything they shared.

Q. So her saying she stole the phone would not have mattered in your analysis?

A. Correct. 'Cause I wouldn't have seen it as she had stolen the phone.

Additionally, Detective Reyes stated that he did not know prior to drafting his affidavit that Pacheco told Detectives Lopez and Segura that she had broken up with Martin, that she had told Martin she had destroyed the phone, or that she had described Martin as protective of his phone.

After the search warrant was signed, a forensic search revealed images of child pornography stored on the phone. According to Detective Reyes, with these results, he was able to determine a crime had been committed, and he began a detailed investigation, which entailed determining, "[w]ho the device belonged to, who had it and for how long, where did it come from, who viewed it, . . . [w]hen were the images uploaded or downloaded onto the phone, how did they get there, [and] who put them there."

## 2.  The Trial Court's Findings of Fact and Conclusions of Law

At the conclusion of the hearing, the associate judge took the matter under advisement and, later, issued eleven pages of findings of fact and conclusions of law.  Among the findings of fact are the following:

> 6.  The defendant testified that he was the owner of the cell phone in question, never relinquished ownership of it nor gave Ashley Pacheco permission to access it.  He also stated that the cell phone was protected with a passcode of which was never disclosed to Ashley Pacheco and only kept in a hidden password book.  This court finds the defendant's testimony to be truthful and credible.
>
> . . .
>
> 11.  Officer McLeroy testified that he believed the defendant and Ashley Pacheco were common law married due to them "residing together and having a sexual relationship."  His incident report states that Ashley Pacheco advised him that she was in a common law relationship with the defendant but also states that they were engaged to be married.  Officer McLeroy agreed that being engaged to be married means a marriage had not yet occurred.  Based on conflicting evidence, the court finds Officer McLeroy's belief in the existence of a common law relationship between the defendant and Ashley Pacheco to not be truthful nor credible.

Among the conclusions of law are the following:

> 5.  This court finds that Ashley Pacheo was not in a common law relationship with the defendant on January 17, 2021 and thereafter.  Moreover, the court finds that Ashley Pacheco did not have consent to take nor look through this phone.
>
> 6.  The court finds that a private citizen, Ashley Pacheco committed the offense of theft when she took Matthew Martin's phone without his consent and with the intent to deprive him of his phone. . . .
>
> 7.  The court also finds that Ashley Pacheco violated Texas Penal Code § 33.02 breach of computer security, when, without his effective consent, she knowingly accessed Matthew Martin's email account as well as the file applications containing the alleged contraband, without disproving that she did so with the intent to facilitate a lawful seizure or search of, or lawful access to his phone for a legitimate law enforcement purpose.
>
> 8.  This court finds it noteworthy to point out that, with the strictest of interpretations of Article 38.23 of the Texas Code of Criminal Procedure, Ashley Pacheco's theft of the phone was done with the intent to deprive Matthew Martin of the phone itself; not the contents of the phone.  However, due to a subsequent

violation — breach of computer security at the time she accessed his emails and other files on his phone, it is more specifically this violation of the law which would warrant exclusion of the evidence against him in a criminal trial.

. . .

10.  While acknowledging that at the time of the initial theft and breach of computer security of the defendant's cell phone, Ashley Pacheco was not in search of potentially criminal evidence to turn over to police, her sole intent was to deprive the owner of his property in order to search for evidence of infidelity and therefore, it was not to turn over any evidence to the police for investigation.

. . .

14.  Ashley Pacheco's 6-month period of unlawful possession of the defendant's cell phone as well as her assertion throughout the 6 months that she had "destroyed the phone" does not lend itself to the possibility that she intended to return the phone if no criminal evidence was ultimately found.

15.  Because the prevailing caselaw requires courts to interpret Article 38.23 with its plain meaning, any criminal evidence that flowed from a violation of State or federal law ought to be suppressed under this exclusionary rule.  For this reason, it is recommended that the defense's Motion to Suppress be GRANTED.[2]

16.  Had it been found that Article 38.23 was not implicated, Officer McLeroy's search would be evaluated under the Fourth Amendment's exclusionary rule. . . .

17.  Officer McLeroy did not obtain a warrant to manually search the phone, rather, he proceeded under the actual or apparent authority of Ashley Pacheco.  The court finding that his belief was not made in good faith, would also grant the defense's motion to suppress this search.

18.  However, the manual search may not have mattered.  It did not exceed the search already conducted by Ashley Pacheco; and Detective Segura did not know or rely on it to establish probable cause in the application of his search warrant. . .

. . .

20.  The court finds that Detective Reyes relied on Ashley Pacheco's videotaped statement and his first-hand interview with Brianne Heywood to establish probable cause for [a] search warrant of the phone.  The court finds that even if Detective Reyes was not directly informed that there was a possibility that the phone was

---

[2] The introduction to the associate judge's findings and conclusions frames Martin's motion to suppress as raising three issues.  Finding 15 relates to issue 1, that evidence must be suppressed because, "[t]he search of the cell phone by Defendant's former girlfriend was conducted in violation of Texas and Federal criminal statutes."  Finding 24, quoted below, relates to issues 2 and 3.

stolen, Ashley Pacheco's explanation of how she came to discover the phone and its contents brings this possibility to the surface.

. . .

22.  Certain Texas Courts of Appeals and the Fifth Circuit have held that, when a defendant seeks to suppress evidence pursuant to a warrant based on an omission, he must establish by a preponderance of the evidence that the omission was made knowingly, intentionally, or with reckless disregard for the accuracy of the affidavit presented to the magistrate.  The Court would then be tasked to determine whether, had the omitted material been included in the affidavit, would the affidavit still establish probable cause for the search.  If it did not, the court would be required to void the warrant and suppress the evidence seized from it.  *See United States v. Martin*, 615 F.2d 318, 328 [(5th Cir. 1980)].  The court finds that Detective Reyes was reckless in not investigating the truth behind whether the phone was stolen affecting the accuracy of his search warrant affidavit.

23.  In *Martin*, the court stated, "It is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." [*Id.* at 329.]  The court finds that this is the situation here.  The origination of the phone is central to the warrant and its omission was critical in obtaining approval of the warrant.

24.  It is recommended that Defendant's Motion to Suppress issues 2 and 3 be GRANTED.[3]

The trial court adopted the associate judge's findings of facts and conclusions of law and ordered, "the suppression of all evidence alleged to constitute child pornography that was obtained from the search of the Defendant's cell phone by private parties and by police through a manual search and forensic search, from use at the Defendant's trial."

## II.  STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review.  *Armstrong v. State*, 713 S.W.3d 893, 902 (Tex. Crim. App. 2025).  "At the hearing on the motion, the trial court is the sole factfinder and judge of the credibility of the witnesses and of the

---

[3] Issues 2 and 3 are, respectively: "The police officer conducted an illegal manual search of the Defendant's cell phone;" and "The police authored a search warrant affidavit omitting substantive information in violation of *Franks v. Delaware*."  *See supra* note 2.

weight to be given their testimony." *Id.* Therefore, we afford "almost total deference to the trial court's determination of historical facts that the record supports." *State v. Pettit*, 713 S.W.3d 834, 839 (Tex. Crim. App. 2025). We defer to the trial court's findings as to historical facts unless they are unsupported by the record and view the evidence and all reasonable inferences in the light most favorable to the trial court's ruling. *Id.*; *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023); *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). However, we review de novo legal questions and mixed questions of law and fact "that do not turn on credibility and demeanor, such as facts of a case that would establish probable cause." *Espinosa*, 666 S.W.3d at 667; *see also Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022) (specifying de novo review for "application-of-law-to-fact questions that do not turn on credibility and demeanor"). "[T]he trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Espinosa*, 666 S.W.3d at 667. We may reverse only if a trial court's ruling on a motion to suppress is "arbitrary, unreasonable, or outside the zone of reasonable disagreement," or if the trial court misapplied legal principles "to the factual disputes and credibility issues as . . . resolved." *Armstrong*, 713 S.W.3d at 902; *State v. Mazuca*, 375 S.W.3d 294, 307 (Tex. Crim. App. 2012); *see also State v. Rodriguez*, No. PD-0377-24, 2025 WL 2158256, at *2 (Tex. Crim. App. Jul. 30, 2025) (corrected op.; not designated for publication) (reversing where court of appeals applied an abuse-of-discretion standard to determine an issue of law).

## III. Discussion

Briefly put, Pacheco effected a private search, which Martin argues violated criminal laws, requiring exclusion under Texas's statutory exclusionary rule, Article 38.23(a) of the Texas Code of Criminal Procedure. The State argues Pacheco did not violate any law. Later, the police

obtained a warrant, which could allow for an exception to statutory exclusion under Article 38.23(b). The State argues that this exception applies even if Pacheco violated a criminal law. Martin argues that the exception cannot apply because the affidavit supporting the warrant was misleading, as he attempted to show during the *Franks* hearing.

We begin our analysis with the statutory exclusionary rule of Article 38.23(a). In short, we hold, as a legal matter, the rule applies to the facts of this case, as those facts were found by the trial court and reasonably supported by the evidence. The trial court, however, did not explicitly consider the Article 38.23(b) exception. To determine whether that exception applies where, as here, a warrant affidavit relies on tainted information, we must consider objective reasonableness. *See McClintock v. State*, 541 S.W.3d 63, 71–72 (Tex. Crim. App. 2017). We hold, upon de novo review of this legal matter, that the Article 38.23(b) exception is not met because an objectively reasonable officer preparing the affidavit would not have believed that the information supporting the warrant was untainted by illegal conduct. *See id.* Consequently, the exception in Article 38.23(b) does not apply, and suppression is required by Article 38.23(a). Thus, we affirm the trial court, although our analysis differs slightly. *See Espinosa*, 666 S.W.3d at 667.

## 1. The Statutory Exclusionary Rule: Article 38.23(a)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "A search, conducted without a warrant, is *per se* unreasonable, subject to certain 'jealously and carefully drawn' exceptions." *Rodriguez*, 521 S.W.3d at 9 (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)). However, "[t]he Fourth Amendment's warrant requirement applies only

to government agents, not private actors." *Id.* at 10 (citing *Burdeau v. McDowell*, 256 U.S. 465, 474 (1921)).

Texas affords a broader protection than the Fourth Amendment by its statutory exclusionary rule. *See* TEX. CODE CRIM. PRO. ANN. art. 38.23; *Wilson v. State*, 311 S.W.3d 452, 458 (Tex. Crim. App. 2010). Texas Code of Criminal Procedure Article 38.23(a) provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PRO. ANN. art. 38.23(a). Unlike the Fourth Amendment, this statutory exclusionary rule "applies to searches and seizures by private citizens." *Rodriguez*, 521 S.W.3d at 11 n.3; *see State v. Johnson*, 939 S.W.2d 586, 587 (Tex. Crim. App. 1996) ("No doubt, the plain language of art. 38.23 supports the conclusion that the unlawful or unconstitutional actions of *all* people, governmental and private alike, fall under the purview of Texas' exclusionary rule."). A defendant seeking suppression under Article 38.23 has the initial burden to establish a statutory violation. *State v. Robinson*, 334 S.W.3d 776, 778–79 (Tex. Crim. App. 2011). "Only when this burden is met does the State bear a burden to prove compliance." *Id.* The burden of persuasion is permanently upon the moving party. *Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005).

For Article 38.23(a), "evidence is 'obtained' in violation of the law only if there is some causal connection between the illegal conduct and the acquisition of evidence." *Wehrenberg v. State*, 416 S.W.3d 458, 468 (Tex. Crim. App. 2013). "[E]vidence is not 'obtained' in violation of the law within the plain meaning of Article 38.23 if the taint from the illegality has dissipated by the time the evidence is acquired." *Id.* at 469. "Thus, when the causal relationship between the illegality and the acquisition of evidence is attenuated, exclusion is not required because the

ordinary meaning of 'obtained' does not extend to such a remote, or 'attenuated,' causal relationship." *Id.*

Here, the trial court suppressed "all evidence alleged to constitute child pornography that was obtained from the search of the Defendant's cell phone by private parties and by police through a manual search and forensic search, from use at the Defendant's trial." The State does not assert that the attenuation doctrine applies. Martin argues that Pacheco violated the criminal laws of theft and breach of computer security, triggering the statutory exclusionary rule. *See* TEX. PENAL CODE ANN. §§ 31.03(a), 33.02(a). Although not briefed by the parties, we note there is some causal connection between the alleged theft of Martin's phone and the acquisition of the suppressed evidence, in that Pacheco's possession of the phone in July 2021, allowed her an opportunity to access the contents of the phone, which she otherwise would not have had. The causal connection between breach of computer security and the acquisition of the suppressed evidence is more direct, in that Pacheco's search in July 2021, uncovered evidence alleged to constitute child pornography, and the search itself is the basis for the alleged crime. Thus, either crime if proved would allow for exclusion of evidence under Article 38.23(a). We consider the alleged crimes in turn.

**A. Theft**

A person commits the offense of theft if the person "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a). Appropriation is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b). Accepting the trial court's fact findings and reasonable inferences in favor of its ruling, we hold evidence adduced at the *Franks* hearing establishes that Pacheco committed theft of Martin's cell phone.

The evidence establishes that Martin was the owner of the cell phone. "Owner" is defined expansively by the Penal Code to mean a person who "has title to the property, possession of the

property, whether lawful or not, or a greater right to possession of the property than the actor." TEX. PENAL CODE ANN. § 1.07(35); *see Garza v. State*, 344 S.W.3d 409, 413 (Tex. Crim. App. 2011). "Possession" means "actual care, custody, control, or management." *See* TEX. PENAL CODE ANN. § 1.07(39). "Thus, under the Penal Code, any person who has a greater right to the actual care, custody, control, or management of the property than the defendant can be alleged as the 'owner.'" *Alexander v. State*, 753 S.W.2d 390, 392 (Tex. Crim. App. 1988) (footnote omitted); *see Morgan v. State*, 501 S.W.3d 84, 91 (Tex. Crim. App. 2016) (holding girlfriend was "owner" of apartment because she had greater right to possess the apartment than her boyfriend, although both lived there). "A person's 'right to possession' must be measured at the time of the accused's alleged criminal act." *Ramirez v. State*, 429 S.W.3d 686, 688 (Tex. App.—San Antonio 2014, pet. ref'd) (citing *Freeman v. State*, 707 S.W.2d 597, 603 (Tex. Crim. App. 1986)).

Martin was the owner of the cell phone when Pacheco removed the phone from the safe upon moving out of his home because Martin had a greater right to possess the cell phone than Pacheco at that time. *See* TEX. PENAL CODE ANN. § 1.07(35). Martin testified that he purchased the cell phone in 2016, and never relinquished ownership. Pacheco confirmed during her recorded statement that the phone she found in the safe was "absolutely his phone, his old phone." At the police substation, she asked whether she would be in trouble for stealing it. Although the parties shared a safe while living together, Pacheco's access to the phone while cohabitating with Martin did not confer a greater right to possession when Pacheco moved out, just as Martin had no greater right to possess Pacheco's jewelry, also kept in the safe, after Pacheco moved out. *Cf. Freeman*, 707 S.W.2d at 605–06 (explaining a fiduciary who decides to "unlawfully and permanently deprive the lawful owner of the property . . . is then acting in an unauthorized capacity"). Nor did Pacheco assert a community-property interest in the phone, which, in any event, would not resolve the

matter. *See Morrow v. State*, 486 S.W.3d 139, 1665 (Tex. App.—Texarkana 2016, pet. ref'd) (holding wife had greater right to possession of home despite husband's asserted community-property interest).

Pacheco's appropriation of the phone upon moving out was unlawful because it was without Martin's effective consent. *See* TEX. PENAL CODE ANN. § 31.03(a), (b). "Consent" means "assent in fact, whether express or apparent." *Id.* § 1.07(11). There is no evidence in the record that Martin gave Pacheco express consent to possess his phone when moving out. Instead, the evidence shows that Martin was "weird" and "possessive of" his phone, as Pacheco put it in her interview. Martin testified that the phone was password protected; he never gave Pacheco permission to unlock the phone; and when he allowed Pacheco to use the phone, he would open the phone and hand it to her. Pacheco's statements, other than as to password protection, are consistent. She stated that when she borrowed Martin's phone, "[h]e would be right there," and she gave as an example a time she borrowed Martin's phone to take a picture of his children that suggested Martin was hesitant to lend it to her, even for that limited purpose.

Nor can consent be inferred. As to the safe, according to both Martin and Pacheco, Martin owned the safe and gave Pacheco the combination, and they both kept important items in the safe. These statements imply that both individuals had access to a shared, secure location to deposit important items in Martin's home, but the statements do not reasonably imply that Pacheco had consent to take from the safe items that Martin had a greater right to possess upon moving out of his home. Consent also is not apparent from the fact that Martin knew Pacheco took the phone. Martin testified that he told Pacheco she did not have permission to access his phone and that he did not approve of her sending photos and videos from the phone to him. A few weeks after taking

the phone, Pacheco told Martin that she had destroyed the phone, which cuts against an inference of consent by Pacheco's continued possession.[4]

By taking Martin's phone when she left, Pacheco deprived Martin of the phone. "Deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." *Id.* § 31.01(2)(A). Pacheco deprived Martin of the phone because the evidence shows that Pacheco withheld the phone from Martin from January to July 2021, and nothing in the record indicates any intent by Pacheco to return the phone to Martin. Instead, Pacheco told Martin she had destroyed his phone, which raises a reasonable inference that Pacheco never intended to return the phone to Martin.

Moreover, the evidence indicates that Pacheco took the phone to investigate infidelity, not to assist police with a criminal investigation. Pacheco told Officer Heywood at the substation that she took the phone, "Just cus I found because there's a lot of girls in there," referring to adult women. In her recorded statement, too, she described finding evidence of Martin's ongoing relationships with other women when she accessed the phone in January 2021. In both her statement at the substation and in her interview the next day, she explained that she searched the phone again in July 2021, based on a "gut feeling" because she "felt like there was a reason why" Martin was expending so much energy attempting to reconcile.

The State argues that this case is not like *Jenschke v. State*, 147 S.W.3d 398, 403 (Tex. Crim. App. 2004), and *State v. Johnson*, 939 S.W.2d 586, 587 (Tex. Crim. App. 1996), in that Pacheco did not suspect a crime and undertake her own investigation to prove the crime. *See*

---

[4] The State does not argue that Martin abandoned the phone. *See State v. Granville*, 423 S.W.3d 399, 409 (Tex. Crim. App. 2014) ("Although a person may have a reasonable and legitimate expectation of privacy in the contents of his cell phone, he may lose that expectation under some circumstances, such as if he abandons his cell phone, lends it to others to use, or gives his consent to its search." (footnotes omitted)); *see also Martinez v. State*, 689 S.W.3d 30, 42 (Tex. App.—Fort Worth 2024, pet. ref'd) ("Abandonment is primarily a question of intent.").

*Jenschke*, 147 S.W.3d at 403 (excluding evidence where family of sexual assault victim broke into defendant's truck, took used condom, had it DNA tested, and two years later turned it over to police); *Johnson*, 939 S.W.2d at 588 (affirming trial court's order excluding evidence where decedent's son's broke into a funeral home, searched and found evidence related to decedent's murder, and turned evidence over to police). We agree with the State that the instant case is distinguishable on that basis. However, a reasonable inference from the evidence is that Pacheco took Martin's phone for her own investigation of infidelity, which, while not an investigation of a crime, is similar to the intent to personally investigate held by those "other persons" in *Jenschke* and *Johnson*. As with the family in *Jenschke*, Pacheco's intent when she took Martin's phone — as can reasonably be inferred from the evidence — was to deprive an owner of property, even though the property was ultimately turned over to police. *See Jenschke*, 147 S.W.3d at 403; *see also State v. Dixon*, No. 13-09-00445-CR, 2010 WL 3419231, at *8–9 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2010, pet. ref'd) (mem. op., not designated for publication) (affirming exclusion of evidence after individual found cell phone, believing it held music, and took it without intent to return it to the owner or turn it over to police).

None of these cases are like *Stone v. State*, 574 S.W.2d 85, 88–89 (Tex. Crim. App. 1978), described by *Jenschke* as the "leading case," which held there was no intent to deprive by a baby-sitter, who noticed photographs of a child being sexually abused while in the defendant's apartment with his permission, and who then gave the photos to the defendant's apartment manager, who turned them over to police. *See Jenschke*, 147 S.W.3d at 400 (citing *Stone*, 574 S.W.2d at 88–89); *see also Cobb v. State*, 85 S.W.3d 258, 271 (Tex. Crim. App. 2002) (affirming trial court's determination that defendant's father did not commit theft when he found and took five knives

from son's apartment and gave them to police after defendant's girlfriend asked the father to go to the couple's apartment to retrieve keys).

In sum, based on the trial court's findings that are reasonably supported by the record, and viewing the evidence and all reasonable inferences in the light most favorable to the trial court's ruling, the evidence establishes that Pacheco committed theft of Martin's phone when she took the phone upon moving out of his home in January 2021. *See* TEX. PENAL CODE ANN. § 31.03(a); *Pettit*, 713 S.W.3d at 839.

**B. Breach of Computer Security**

Likewise, when viewing the findings and evidence in the appropriate light, we hold the record establishes Pacheco's commission of the offense of breach of computer security. *See* TEX. PENAL CODE ANN. § 33.02(a).

A person commits the offense of breach of computer security if the person "knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." TEX. PENAL CODE ANN. § 33.02(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id*. § 6.03(b). "Whether or not someone acts knowingly is left to the factfinder based on the inferences that the factfinder must draw from the evidence admitted." *Runyon v. State*, 674 S.W.3d 624, 633 (Tex. App.—Beaumont 2023, pet. ref'd).

Regarding "effective consent," here, as in *Baird v. State*, 398 S.W.3d 220, 238 (Tex. Crim. App. 2013), "[t]he issue is not whether any consent that the appellant may have given was 'effective' as that term is defined in the Penal Code, but whether [the appellant] gave any consent at all." *Id*. (Tex. Crim. App. 2013) (footnote omitted, citing TEX. PENAL CODE ANN. § 1.07(a)(19)).

"Consent" is defined as "assent in fact, whether express or apparent." TEX. PENAL CODE ANN. § 1.07(11). The State does not contend that Martin gave express assent. Thus, our focus is on whether Martin gave apparent assent. For assent in fact to be apparent, the assent must be "clear or manifest to the understanding." *Baird*, 398 S.W.3d at 229. "For 'assent' 'in fact' to occur . . . there must be an actual or real agreement after thoughtful consideration." *Id.*; *see also Thomas v. State*, 586 S.W.3d 413, 421 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("For there to be apparent assent, the assent must be clear and manifest to the parties' understanding, despite there being no express communication.").

The trial court's findings and reasonable inferences drawn from the evidence establish that Pacheco knowingly accessed the contents of Martin's phone in July 2021, without Martin's effective consent. As explained above, Pacheco had access to the exterior of Martin's phone because she unlawfully appropriated the phone from his home with the intent to deprive him of the phone, which constituted theft. *See* TEX. PENAL CODE ANN. § 31.03(a). Pacheco's unlawful possession of the exterior of the phone allowed her, in July 2021, to "access" the contents of the cell phone. "Access" means "to approach, instruct, communicate with, store data in, retrieve or intercept data from, alter data or computer software in, or otherwise make use of any resource of a computer, computer network, computer program, or computer system." TEX. PENAL CODE ANN. § 33.01(1). Pacheco accessed the phone by retrieving photos stored on the phone through her use of the Zip Extractor application.

Martin's cell phone is an Apple iPhone 6s, a type of "smart phone," which is "a cell phone with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity." *Riley v. California*, 573 U.S. 373, 379 (2014). Martin's phone qualifies as a "computer," as that term is defined in the Penal Code. *See* TEX. PENAL CODE

ANN. § 33.01(4). Moreover, because Martin's cell phone is a computer with a broad range of functions and a large storage capacity, "there is a significant distinction between the cell phone's exterior and its digital contents." *Martinez v. State*, 689 S.W.3d 30, 39 (Tex. App.—Fort Worth 2024, pet. ref'd). Therefore, even if Pacheco had lawful possession of Martin's phone — which was not the case in July 2021 — such possession would not establish that she could access the digital contents of the phone without committing the crime of breach of computer security. *Cf. State v. Granville*, 423 S.W.3d 399, 408–09, 417 (Tex. Crim. App. 2014) (holding defendant had reasonable expectation of privacy in contents of cell phone being temporarily stored in jail property room).

The evidence and reasonable inferences show that Pacheco knew she lacked "actual or real agreement after thoughtful consideration" or assent that was "clear or manifest to the understanding," such that she could have had Martin's consent to access the digital files on his phone in July 2021. *See Baird*, 398 S.W.3d at 229. First, she did not have lawful possession of the phone in July 2021, when she accessed the digital files, for the reasons discussed in our theft analysis. Second, the evidence viewed favorably to the trial court's ruling shows that Pacheco told Martin in February 2021 that she had destroyed his phone. If Martin did not know that the contents of his phone could be accessed by Pacheco because of her untruthfulness, it is doubtful there could be any "real agreement after thoughtful consideration," for her access to the digital contents of the phone. *See Baird*, 398 S.W.3d at 229. Third, the trial court found that the phone was passcode protected, and the passcode was never disclosed to Pacheco. *Cf. Gonzalez v. State*, 608 S.W.3d 98, 104 (Tex. App.—San Antonio 2020, pet. ref'd) ("Passcodes effectively exclude others from access and demonstrate a clear expectation of privacy."). Fourth, Martin was "possessive" of his phone, as Pacheco described, and, according to Pacheco, when Martin let her use his phone he

would be "[r]ight there." Martin testified that he would let Pacheco use his phone only after he opened it and handed it to her.

Evidence that could suggest consent is minimal and attenuated. That Martin shared his safe with Pacheco before they broke up does not necessarily imply consent for her to access the contents of his phone, and, in any event, it implies even less to suggest consent after Pacheco ended her engagement with Martin and took his phone from the safe. The State directs us to evidence showing that Martin shared a phone account with Pacheco and shared his location with her electronically even after they ended their engagement. However, there is no indication in the record that the shared account allowed either person significant access to the other's private data. *Cf. Granville*, 423 S.W.3d at 408 ("A cell phone . . . can receive, store, and transmit an almost unlimited amount of private information."). To the extent location sharing could imply anything about consent, on this record, it cuts against a finding of consent because Pacheco stated that Martin had turned off his location sharing before she accessed the Zip Extractor application on his phone.

The State cites in support *Thomas v. State*, 586 S.W.3d 413, 422 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd), arguing that the *Thomas* court found that the defendant in that case failed to carry his burden "to show that his girlfriend lacked apparent consent to look in his phone based on facts like she had used his phone previously and he shared personal information with her like his credit card and his debit card PIN." However, the *Thomas* court did not make this holding. The court explicitly declined to decide whether the defendant had proved his girlfriend lacked apparent assent, describing it as "a compelling issue argued persuasively by both sides." *Id.* Instead, the court determined that the defendant had not proved that his girlfriend accessed his phone "*knowing* that she lacked [the defendant's] apparent assent." *Id.* (emphasis added). It held:

"The trial court could have found that no violation of section 33.02 occurred because the record supports a finding that [the girlfriend] *was not aware* of the surrounding circumstances that she lacked appellant's effective consent when she accessed the iPhone's photo application." *Id.* (emphasis added).

*Thomas* is also distinguishable on the basis that it does not contain the salient facts of this case: that a woman took her ex-fiancé's phone from his home and safe and told him she had destroyed it. Additionally, *Thomas*, like many appeals considering the exclusionary rule in child-pornography cases, arises from the denial of a motion to suppress. Consequently, in contrast to the instant case, findings of fact, if made, are largely unfavorable to the defendant and inferences are drawn in favor of denial. *See, e.g.*, *Baird*, 398 S.W.3d at 230 (affirming denial of suppression where defendant hired woman to care for his dog while away, invited her to help herself to anything, told her to keep the bedroom door closed to keep the dog out, and did not expressly forbid her from using his computer, on which she found child pornography); *Runyon v. State*, 674 S.W.3d 624, 634–35 (Tex. App.—Beaumont 2023, pet. ref'd) (affirming denial of suppression where defendant allowed girlfriend to use his laptop, and girlfriend found child pornography when defendant left his laptop on and unlocked); *Kane v. State*, 458 S.W.3d 180, 187–88 (Tex. App.—San Antonio 2015, pet. ref'd) (affirming denial of suppression where teacher routinely checked classroom for articles left by students; found a flash drive, which contained child pornography; and viewed it only to obtain information to facilitate returning it to its owner).[5]

---

[5] The State does not argue that Section 33.02(e) is applicable. The subsection provides as a defense, "that the person acted with the intent to facilitate a lawful seizure or search of, or lawful access to, a computer, computer network, or computer system for a legitimate law enforcement purpose." *See* TEX. PENAL CODE ANN. § 33.02(e); *see State v. Ruiz*, 577 S.W.3d 543, 548 (Tex. Crim. App. 2019) (reversing trial court's suppression order where "undisputed evidence showed that [principal] took [substitute teacher's] phone and looked through it for the purpose of giving it to the police for investigation."). The evidence shows Pacheco looked through Martin's phone to "cross reference" information when Martin was attempting to reconcile with her and, later, after finding the tracker, based on a "gut feeling." Her searches do not suggest "legitimate law enforcement purposes." *See* TEX. PENAL CODE ANN. § 33.02(e).

In short, the trial court's findings supported by the record and reasonable inferences establish that Pacheco committed the offense of breach of computer security. *See* TEX. PENAL CODE ANN. § 33.02(a); *Pettit*, 713 S.W.3d at 839.

### C. Necessity Defense

Citing only to section 9.22 of the Penal Code, the State argues that Pacheco's actions in searching the phone after finding the tracking device were justified by necessity. Section 9.22 provides:

Conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22. The State argues only the first prong, asserting Pacheco acted out of necessity to avoid imminent harm because, "[a]t that moment, [Martin] knew her location and she was going to take off the tracker. For all she knew, [Martin] had been following her and looking in the phone was one way to find that out."

We hold the necessity defense is not raised by this record and, if it is, the evidence disproves it. Nothing in the record suggests that Martin knew Pacheco was "going to take off the tracker" immediately after she found it and, in fact, police removed the tracker later that day after Pacheco's substation visit. Pacheco stated at both the substation and later during her interview that she looked through the phone after finding the tracker to understand why Martin wished to

track her. She did not articulate any belief of imminent harm, and she was with her cousin, a former peace officer, when she found the tracker.

In sum, Pacheco committed theft and breach of computer security; her actions were not justified by necessity; and the evidence she obtained must be excluded under the statutory exclusionary rule. *See* TEX. PENAL CODE ANN. §§ 9.22, 31.03(a), 33.02(a); TEX. CODE CRIM. PRO. ANN. art. 38.23(a).

### D. Fruit of the Poisonous Tree: Ms. Heywood's and Officer McLeroy's Searches

However, the above analysis does not directly address the manual searches conducted by Ms. Heywood and Officer McLeroy or the forensic search, conducted by police pursuant to a warrant. To address these searches we must consider the fruit-of-the-poisonous-tree doctrine.

The fruit-of-the-poisonous tree doctrine serves to exclude from evidence both direct and indirect products of unconstitutional or illegal searches. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Johnson*, 939 S.W.2d at 588 (affirming suppression of evidence from subsequent searches as "fruit" of evidence obtained illegally by private citizens). Evidence is not excluded merely because it would not have been discovered but for the violation; "[r]ather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 488 (citation omitted); *State v. Iduarte*, 268 S.W.3d 544, 550 (Tex. Crim. App. 2008). Article 38.23(a)'s statutory exclusionary rule "is broad enough to embrace the fruit-of-the-poisonous-tree doctrine." *McClintock*, 541 S.W.3d at 72; *accord Day v. State*, 614 S.W.3d 121, 128 (Tex. Crim. App. 2020).

The parties do not address the fruit-of-the-poisonous-tree doctrine, even though the trial court excluded evidence obtained from searches of Martin's phone "by private parties and by police through a manual search and forensic search." Ms. Heywood is a private party who viewed Martin's phone before the police obtained a warrant, and she provided a statement that Detective Reyes relied on when drafting his warrant affidavit. Likewise, Officer McLeroy searched the phone at the substation, as recorded by his body-worn camera. We hold that evidence obtained from Ms. Heywood's and Officer McLeroy's searches is properly excluded as indirect products of Pacheco's unlawful search because these searches were done at Pacheco's prompting shortly after she discovered photos that could constitute child pornography and were not obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 487.

## 2. The Exception to Exclusion: Article 38.23(b)

The more difficult question is whether evidence obtained through the police's forensic search of the phone, which was authorized by a warrant, must be suppressed. To address this matter, we must consider Article 38.23(b), which provides: "It is an exception to the provisions of Subsection (a) of this Article that the evidence was obtained by a law enforcement officer acting in objective good faith reliance upon a warrant issued by a neutral magistrate based on probable cause." TEX. CODE CRIM. PROC. ANN. art. 38.23(b).[6]

The Court of Criminal Appeals explored the Article 38.23(b) exception in detail in *McClintock v. State*, 541 S.W.3d 63 (Tex. Crim. App. 2017). In *McClintock*, the circumstances of the case raised the question: "How should Article 38.23(b) apply, if at all, when the warrant

---

[6] Although the parties addressed this statutory exception in their trial court briefing, the trial court's findings do not mention it, instead suggesting, "any criminal evidence that flowed from a violation" of law must be suppressed under the statutory exclusionary rule. We affirm because, after considering the statutory good-faith exception, we determine it is not met. *See Espinosa*, 666 S.W.3d at 667; *see also McClintock v. State*, 541 S.W.3d 63, 74 n.20 (Tex. Crim. App. 2017) (affirming on different theory than one adopted by trial court).

affidavit supplies probable cause but that probable cause appears to be tainted by a prior illegality?" *McClintock*, 541 S.W.3d at 66  (discussing a canine search of the curtilage of a home, which uncovered evidence supporting probable cause, and subsequent Supreme Court precedent calling into question the constitutionality of such searches).  The Texas Court of Criminal Appeals' answer, adopted from the Fifth Circuit's consideration of the fruit-of-the-poisonous-tree doctrine and the federal exclusionary rule was:

> Two separate requirements must be met for evidence to be admissible: (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be 'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant[] was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*.[7]

*McClintock*, 541 S.W.3d at 71–72 (quoting *United States v. Massi*, 761 F.3d 512, 528 (5th Cir. 2014)).[8]

Here, the State argues that the trial court erred by analyzing, from a subjective perspective only, whether the police officers acted in good faith — albeit within a Fourth Amendment analysis and not an Article 38.23(b) analysis.  The State asserts: "[T]he question is whether the officers had an objective good-faith basis to believe that they had a valid search warrant based on the apparent authority over Martin's old phone given to them by Pacheco.  *McClintock*, 541 S.W.3d at 73."

_____

[7] *Leon* articulated a good faith exception to the federal exclusionary rule, such that "evidence obtained during the execution of a warrant later determined to be deficient is nonetheless admissible if the executing officer's reliance on the warrant was objectively reasonable and made in good faith." *United States v. Woerner,* 709 F.3d 527, 533 (5th Cir. 2013) (citing *United States v. Leon*, 468 U.S. 897, 921–25 (1984)).  The Supreme Court also described four situations in which the good faith exception would not apply.  *See Woerner,* 709 F.3d at 533–34 (citing *Leon,* 468 U.S. at 921–25); *see also United States v. Massi*, 761 F.3d 512, 530 (5th Cir. 2014).
[8] The *Massi* court ultimately concluded:

> The good faith exception to the exclusionary rule applies here where the search warrant, though ultimately obtained as a result of an illegal detention in violation of the Fourth Amendment, was obtained and executed by a law enforcement officer in good faith and under an objectively reasonable belief that it was valid *and relied upon appropriately obtained evidence.*

*McClintock*, 541 S.W.3d at 72 (quoting *Massi*, 761 F.3d at 532) (emphasis added in *McClintock*).

Martin's brief largely ignores the objective component of the *McClintock* test and asserts Officer Reyes's recklessness.

We agree with the State that we must measure good faith objectively. Initially the question is whether the conduct that uncovered evidence used in a warrant affidavit is "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit would believe that the information supporting the warrant was not tainted by unlawful conduct. *See McClintock*, 541 at 71–72.[9] We hold the Article 38.23(b) exception is not met on this record because the first prong of the *McClintock* test is not satisfied.

**A. Prior Law Enforcement Conduct Must Be Close Enough to the Line of Validity**

*McClintock*'s first prong considers the perspective of "an objectively reasonable officer preparing the affidavit." *McClintock*, 541 S.W.3d at 71 (quoting *Massi*, 761 F.3d at 528). Here, Officer Reyes prepared the affidavit. To do so, he "watched just about all of" Pacheco's recorded statement and he interviewed Ms. Heywood personally. He did not watch video captured by Officer McLeroy's body-worn camera from Pacheco's substation visit, and, of course, he did not have Martin's testimony from the suppression hearing. We do not consider the facts found by the trial court because an officer would not have fact-findings from a *Franks* hearing before writing an affidavit. Martin's testimony principally contradicted Pacheco's statements that Martin's phone was not passcode protected, and the trial court found that it was.

An objectively reasonable officer preparing the warrant affidavit would have gathered material similarly to Officer Reyes. Officer Reyes did not interview Pacheco personally because he was off duty on the day of her interview; he did not review the substation video because,

---

[9] *McClintock* concerned Article 38.23(b) and police conduct that was unconstitutional. Here, we consider the conduct of a private citizen that violated criminal law. Accordingly, we have substituted "unlawful" for "unconstitutional" and "private conduct" for "police conduct" where necessary to align the *McClintock* test with the particular Article 38.23(a) exclusion involved in this case.

according to Officer Reyes's testimony, the video was not in the police computers at the time he prepared his affidavit and he did not know it existed; and Officer Reyes believed he could rely strictly on Pacheco's and Ms. Heywood's interviews. Officer Reyes conducted an objectively reasonable investigation prior to preparing his affidavit.

However, while the investigation was reasonable, Officer Reyes did not act reasonably by failing to appreciate the timeline of events and the circumstances that led to Pacheco possessing and searching the phone. An objectively reasonable officer would have had enough information from the investigation that Officer Reyes conducted, or one like it, to determine that Pacheco had committed the crimes of theft and breach of computer security.

As to theft, Pacheco stated at her recorded interview, which was consistent with Ms. Heywood's statement, that she took Martin's phone upon moving out of his home and later told him she had destroyed the phone. She retained the phone for six months and did not represent that she had Martin's consent to possess the phone after she ended her engagement with him. An objectively reasonable officer could have credited Pacheco's testimony that the phone was not passcode protected. However, Pacheco's theft was of the phone itself — the phone's exterior, as opposed to its contents — and the passcode has little bearing on whether Pacheco unlawfully appropriated Martin's phone with the intent to deprive him of it, as explained in our analysis above. *See* TEX. PENAL CODE ANN. § 31.03(a); *Martinez*, 689 S.W.3d at 39. From Pacheco's and Ms. Heywood's statements, an objectively reasonable officer would have determined that Pacheco had committed theft of Martin's phone and would have believed the evidence was tainted and subject to exclusion. *See McClintock*, 541 at 71–72.

As to the offense of breach of computer security, an objectively reasonable officer would have determined that Pacheco committed the offense. Pacheco stated during her interview that

she took the phone in January 2021, and told Martin she had destroyed it in February 2021. Ms. Heywood's statement was consistent, although she did not specify when Pacheco told Martin she had destroyed the phone. Additionally, Pacheco described Martin as "possessive" of his phone; yet, Pacheco searched Martin's phone in July 2021. From this evidence, an objectively reasonable officer would have determined that Pacheco knew she lacked "actual or real agreement after thoughtful consideration" or assent that was "clear or manifest to the understanding," such that Pacheco could have had Martin's effective consent to access the digital files on his phone in July 2021. *See* TEX. PENAL CODE ANN. § 33.02(a); *Baird*, 398 S.W.3d at 229.

To be sure, Pacheco's statement that the phone was not passcode protected alters the analysis from our analysis above; however, the resolution remains the same. The State cites *Limon v. State*, 340 S.W.3d 753, 755 (Tex. Crim. App. 2011), to argue that Pacheco had common authority or apparent authority over the phone such that the police could rely on her consent to search the phone.[10] Common authority and apparent authority are concepts that are not directly related to whether Pacheco committed breach of computer security, which requires access of a computer without "effective consent." *See* TEX. PENAL CODE ANN. § 33.02(a).[11] The record shows that Pacheco offered officers a phone that was turned on, open, and not passcode protected. However, she also gave an account of how she came to possess and search the phone that included a description of Martin's possessiveness of his phone, that Pacheco had taken his phone, that she had told him she had destroyed it, and that months later she searched his phone. "Cell phones are intrinsically private, and the failure to password protect access to them is not an invitation for

---

[10] *Limon* concerned whether it was reasonable for an officer to believe a teenager had authority to invite the officer to enter into a home. *Limon*, 340 S.W.3d at 759.

[11] "Common authority is shown by mutual use of the property by persons generally having joint access or control for most purposes." *State v. Rodriguez*, 521 S.W.3d 1, 19 (Tex. Crim. App. 2017). Apparent authority is judged under an objective standard to determine whether reasonable belief can be formed that a consenting party has authority, and reasonableness hinges on "widely shared social expectations." *Limon*, 340 S.W.3d at 756–57 (quoting *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)).

others to snoop." *State v. Peoples*, 378 P.3d 421, 426 (Ariz. 2016). We hold that an objectively reasonable officer could not have determined that Pacheco had "effective consent" based on the history she related in her interview, which Ms. Heywood confirmed in key respects.

Thus, an objectively reasonable officer preparing the warrant affidavit should have known that the evidence of child pornography provided by Pacheco was obtained by theft and breach of computer security. Either crime alone would suffice for the statutory exclusion of the evidence. *See* TEX. CODE CRIM. PRO. ANN. art. 38.23(a). An objectively reasonable officer also should have known that Ms. Heywood's statement — and Officer McLeroy's statement and video if relied upon — describing the contents of Martin's phone, was tainted as fruit of the poisonous tree. *See Wong Sun*, 371 U.S. at 484; *McClintock*, 541 S.W.3d at 72. Therefore, we hold that the warrant was not obtained under an objectively reasonable belief that the information supporting it was untainted, and the good-faith exception of Article 38.23(b) is not met. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23; *McClintock*, 541 S.W.3d at 71–72.

## IV. CONCLUSION

Because Article 38.23 requires exclusion, we affirm the trial court's order granting Martin's motion to suppress, and lift our previously-imposed stay of trial court proceedings.

Rebeca C. Martinez, Chief Justice

PUBLISH